USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 94-1863 THOMAS R. LUSSIER, Plaintiff, Appellant, v. MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL, Defendant, Appellee.  _________________________ No. 94-1946 THOMAS R. LUSSIER, Plaintiff, Appellee, v. MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL, Defendant, Appellant.  _________________________ ERRATA SHEET ERRATA SHEET The opinion of the Court issued on March 29, 1995, is corrected as follows: On page 3, line 8 change "504(a)" to "501" On page 3, line 9 change "794(a)" to "791" On page 4, line 14 change "794(a)" to "791" UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1863 THOMAS R. LUSSIER, Plaintiff, Appellant, v. MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL, Defendant, Appellee. _________________________ No. 94-1946 THOMAS R. LUSSIER, Plaintiff, Appellee, v. MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL, Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ John F. Lambert, Jr., with whom Thomas V. Laprade and Black, ____________________ _________________ ______ Lambert, Coffin & Rudman were on brief, for plaintiff. ________________________ Jeffrey A. Clair, with whom Frank W. Hunger, Assistant __________________ ________________ Attorney General, Jay P. McCloskey, United States Attorney, _________________ Robert S. Greenspan and Sandra Wien Simon, Attorneys, Appellate ____________________ __________________ Staff, Civil Division, Dep't of Justice, were on brief, for defendant. _________________________ March 29, 1995 _________________________ SELYA, Circuit Judge. After determining that the SELYA, Circuit Judge. ______________ United States Postal Service (the Service) wrongfully discharged Thomas Lussier because of his post-traumatic stress disorder, the district court made an award that included future damages, sometimes called "front pay." Both parties consider the award to be a dead letter. Their cross-appeals pose two kinds of questions. The principal inquiry implicates the collateral source rule and requires us to decide whether a district court may tailor a front pay award, stemming from a finding of disability discrimination under the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (codified as amended at 29 U.S.C. 701-796i), to account for an increase in Veterans Administration (VA) benefits occasioned by the adverse employment action. The second inquiry also touches upon the collateral source rule, but turns on a determination of when, and under what circumstances, a district court, after the parties have rested, may solicit and consider factual information germane to an issue in the case without formally reopening the record. On the first issue, we hold that it is within the trial court's discretion to tailor a front pay award to take account of collateral benefits in a discrimination case, and that the court acted within the realm of this discretion in the case at bar. On the second issue, we hold that once the record is closed, a district court, absent waiver or consent, ordinarily may not receive additional factual information of a kind not susceptible to judicial notice unless it fully reopens the record and 3 animates the panoply of evidentiary rules and procedural safeguards customarily available to litigants. Finding, as we do, that the district court transgressed this rule, we cancel the award and stamp the matter "returned to sender." I. BACKGROUND I. BACKGROUND Lussier sued his quondam employer in Maine's federal district court alleging, inter alia, that his discharge from the _____ ____ Service on March 4, 1992, amounted to disability discrimination in violation of section 501 of the Rehabilitation Act of 1973, 29 U.S.C. 791.1 A bench trial ensued. Since these appeals focus exclusively on the front pay award and do not concern either the antecedent question of liability or the propriety of other remedies, we discuss only the evidence relating to the form and amount of front pay. The plaintiff's expert, Dr. Allan McCausland, testified that, had Lussier not been fired, his future earnings and fringe benefits over a projected 25-year work expectancy would have aggregated between $790,805 and $1,067,193 when reduced to present value. The Service did not directly contradict these estimates, but introduced evidence that Lussier's cloud had a small silver lining; he had been receiving VA benefits for a military-service-related disability, and the circumstances surrounding his ouster from the post office exacerbated this disability and triggered an increase in those benefits. Moreover  ____________________ 1The named defendant is the Postmaster General, but, for all intents and purposes, the Service is the real party in interest, and we treat it as such. 4 it is said, after all, that the postman always rings twice  Patricia Asdourian, a Postal Service human resources specialist, testified that Lussier would also be receiving disability benefits through the Civil Service Retirement System (CSRS) as an incident of his discharge. Lussier had applied for CSRS benefits only a few weeks before trial and the precise benefit level was, therefore, unknown. Nonetheless, Asdourian predicted that Lussier's CSRS benefits would be in the neighborhood of $1185 per month. The Service argued that the present value of both the increase in VA benefits (calculated to be $358,401) and the CSRS disability payments should be deducted from any front pay. On November 9, 1993, the parties rested and the district court took the case under advisement. In due course, it found that the Service had discriminated against Lussier on account of his disability in violation of 29 U.S.C. 791. See ___ Lussier v. Runyon, No. 92-397-P-H, 1994 WL 129776, at *1 (D. Me. _______ ______ Mar. 1, 1994) (Lussier I). The court made an award to the __________ plaintiff, see id. at *11, but declined to order reinstatement ___ ___ because, given the sequelae of the firing, Lussier could no longer perform his accustomed duties. As to future damages, the court found that Lussier would probably be capable at some point of returning to lighter, lower-paying work, and estimated the present value of Lussier's net future lost earnings and fringe benefits to be $790,805. See id. at *9. The court also found, ___ ___ however, that Lussier was slated to receive increased VA benefits worth $358,401 on a present-value basis. It determined that, to 5 prevent a possible windfall, these benefits should offset the recovery Lussier otherwise might obtain as front pay. See id. at ___ ___ *9-*11. The court adopted essentially the same reasoning in respect to CSRS benefits, concluding that these benefits, like the VA benefits, should be factored into Lussier's front pay award to prevent overcompensation. See id. at *11 n.7. But ___ ___ there was a rub: declaring itself "unable to determine Lussier's net economic loss without knowing the outcome of his CSRS application," id. at *11, the court deferred entry of final ___ judgment and ordered the parties to file reports within 30 days concerning the outcome or status of Lussier's application for CSRS benefits. Though objecting to the court's request, Lussier complied under protest. He submitted status reports (the last dated May 2, 1994) disclosing that he was receiving $390 per month in CSRS benefits on an interim basis "pending determination of his final entitlement." Lussier v. Runyon, No. 92-397-P-H, _______ ______ 1994 WL 247873, at *1 (D. Me. May 24, 1994) (Lussier II). The ___________ Service, by contrast, gave the court no concrete information within the 30-day period. It then compounded its omission by ignoring the court's instruction, issued on April 21, directing it to respond within ten days. Judge Hornby, unwilling to wait any longer, entered final judgment on May 24, 1994. Based mainly on the lack of any submission by the Service, the judge seized upon the figure of $390 per month, computed the present value of 6 these monthly payments over Lussier's work expectancy ($112,723), and offset this amount against the potential front pay award. The court thereupon entered a final judgment that included $320,000 in front pay (representing $790,805 in future lost earnings, minus $358,401 in increased VA benefits, minus $112,723 in CSRS benefits). Three days later, the Service moved to alter or amend the judgment, Fed. R. Civ. P. 59(e), "to reflect the fact that a final calculation of the plaintiff's [CSRS] disability retirement annuity has now been made, resulting in a monthly payment effective March 1, 1994, in the amount of $1,111." The district court denied the motion, writing that: The defendant has already had more generosity than it deserves from my initial reopening of the trial record and extensions thereafter. Although the plaintiff may realize somewhat of a "windfall" as a result, awarding the defendant relief would make a mockery of all judicial deadlines and the closing of a trial record. Both parties appeal. II. COLLATERAL BENEFITS II. COLLATERAL BENEFITS These appeals pose an important question: In what manner, if any, does the collateral source rule which bars resort to collateral benefits in connection with the calculation of pecuniary damage awards, see 1 Dan B. Dobbs, Law of Remedies  ___ _______________ 3.8(1), at 372-73 (2d ed. 1993) (describing the collateral source rule as providing "that benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages") apply to awards of front 7 pay? We respond by holding that insofar as front pay is concerned, the effect to be given to collateral benefits  whatever their source is within the equitable discretion of the district court.2 Applying this general principle, we rule that the court below acted within the proper sphere of its discretion in tailoring the plaintiff's front pay award to account for collateral benefits received by the plaintiff as a traceable consequence of the defendant's statutory violation. A. The Letter of the Law. A. The Letter of the Law. _____________________ The Rehabilitation Act makes available in disability discrimination cases the remedies authorized by Title VII of the Civil Rights Act of 1964, see 29 U.S.C. 794a(a)(1), and Title ___ VII, in turn, provides that a court may order "affirmative action . . . which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate," 42 U.S.C.  2000e-5(g). Under this generous language, courts commonly have recognized front pay as a condign remedy. See, e.g., Saulpaugh ___ ____ _________ v. Monroe Community Hosp., 4 F.3d 134, 145 (2d Cir. 1993), cert. ______________________ _____ denied, 114 S. Ct. 1189 (1994); Shore v. Federal Express Corp., ______ _____ ______________________ 777 F.2d 1155, 1158-60 (6th Cir. 1985); Thompson v. Sawyer, 678 ________ ______ F.2d 257, 292 (D.C. Cir. 1982) (collecting cases); see also ___ ____ United States v. Burke, 112 S. Ct. 1867, 1873 n.9 (1992) (noting _____________ _____  ____________________ 2We limit this holding to situations where, as here, (1) front pay is a discretionary equitable remedy, and (2) there is no statutory impediment to factoring collateral benefits into the mix. 8 approvingly, in dictum, that "[s]ome courts have allowed Title VII plaintiffs who were wrongfully discharged and for whom reinstatement was not feasible to recover `front pay' or future lost earnings"); Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, _____ _________________________ 476 (1st Cir. 1993) (recognizing, in dictum, that front pay is an acceptable form of redress under Title VII), cert. denied, 115 S. _____ ______ Ct. 597 (1994); cf. Wildman v. Lerner Stores Corp., 771 F.2d 605, ___ _______ ___________________ 614-16 (1st Cir. 1985) (explicitly recognizing front pay as an equitable remedy under the analogous relief provision of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 626(b) (1988)). These precedents illuminate our path. In light of them, we hold that front pay is an available equitable remedy under Title VII and, hence, under the Rehabilitation Act. Nevertheless, confirming the propriety of the remedy merely takes us to a way station, not to our destination. A further expedition must be mounted if we are to plot the terrain where the collateral source rule and the tenets that inform the computation of front pay intersect. We start along this route by acknowledging that front pay, within the employment discrimination universe, is generally equitable in nature. See, e.g., Shore v. Federal Express Corp., ___ ____ _____ _____________________ 42 F.3d 373, 377-78 (6th Cir. 1994). It follows a fortiori from _ ________ the equitable nature of the remedy that the decision to award or withhold front pay is, at the outset, within the equitable _______________ discretion of the trial court. See, e.g., id.; Saulpaugh, 4 F.3d ___ ____ ___ _________ 9 at 145; 2 Dobbs, supra, 6.10(4), at 214. This court has _____ consistently reached the same conclusion with regard to front pay in the ADEA context, see, e.g., Powers v. Grinnell Corp., 915 ___ ____ ______ ______________ F.2d 34, 42-43 (1st Cir. 1990); Wildman, 771 F.2d at 616, and we _______ perceive no reason why front pay should be characterized differently in respect to its dispensation under Title VII and, correspondingly, under the Rehabilitation Act.3 We rule, therefore, that statutes such as Title VII and the Rehabilitation Act afford trial courts wide latitude to award or withhold front pay according to established principles of equity and the idiocratic circumstances of each case. We think it follows from this premise that the logically derivative question of whether a front pay award, if granted, may be tailored to take collateral benefits into account is also within the court's equitable discretion. This conclusion is supported not only by the brute force of logic, see United ___ ______ States v. O'Neil, 11 F.3d 292, 296 (1st Cir. 1993) (explaining ______ ______ that "the grant of a greater power necessarily includes the grant of a lesser power, unless the authority to exercise the lesser power is expressly reserved"), but also by reference to precedent and to an understanding of the fundamental nature of equity itself. We canvass these sources. 1. Precedent. The weight of authority unquestionably 1. Precedent. _________ favors the view that decisions about whether to consider the  ____________________ 3This is particularly true in view of the close relationship between the ADEA and Title VII. See, e.g., McKennon v. Nashville ___ ____ ________ _________ Banner Publ. Co., 115 S. Ct. 879, 884 (1995). ________________ 10 plaintiff's receipt of collateral benefits in gauging the appropriateness and amount of front pay, and if so, how to calibrate the scales, lie within the equitable discretion of the trial court. See, e.g., Hukkanen v. International Union of ___ ____ ________ _______________________ Operating Eng'rs, 3 F.3d 281, 286 (8th Cir. 1993) (holding under _________________ Title VII that "calculation of front pay . . . is a matter of equitable relief within the district court's sound discretion"); Johnson v. Chapel Hill Indep. Sch. Dist., 853 F.2d 375, 382 (5th _______ ______________________________ Cir. 1988) (similar); see also Jackson v. City of Cookeville, 31 ___ ____ _______ __________________ F.3d 1354, 1360 (6th Cir. 1994) (applying abuse-of-discretion test to evaluate district court's deduction of pension benefits from an ADEA front pay award); Graefenhain v. Pabst Brewing Co., ___________ _________________ 870 F.2d 1198, 1210 (7th Cir. 1989) (similar; specifically stating that whether to deduct such collateral benefits "from a front pay award is a matter committed to the discretion of the trial court"). While the case law does not form a perfect string, see, e.g., Doyne v. Union Elec. Co., 953 F.2d 447, 451-52 ___ ____ _____ _______________ (8th Cir. 1992) (holding that pension benefits should not be considered in fashioning an ADEA front pay award), we deem this virtually seamless array of precedents to be worthy of our allegiance. Our conviction that the majority rule is the better rule is not weakened by the debate that has rent the circuits in regard to whether collateral benefits should be subtracted from 11 back pay awards in employment discrimination cases.4 According to our rough count, courts of appeals have divided four-to-three on this issue. Compare EEOC v. Wyoming Retirement Sys., 771 F.2d _______ ____ _______________________ 1425, 1431 (10th Cir. 1985) (holding under the ADEA that "[d]eduction of collateral sources of income from a back pay award is a matter within the trial court's discretion") and Orzel ___ _____ v. City of Wauwatosa Fire Dep't, 697 F.2d 743, 756 (7th Cir.) _____________________________ (similar), cert. denied, 464 U.S. 992 (1983) and Merriweather v. _____ ______ ___ ____________ Hercules, Inc., 631 F.2d 1161, 1168 (5th Cir. 1980) (similar in ______________ regard to Title VII back pay awards) and EEOC v. Enterprise Ass'n ___ ____ ________________ Steamfitters Local No. 638, 542 F.2d 579, 591-92 (2d Cir. 1976) __________________________ (allowing district court to offset public assistance payments against a Title VII back pay award), cert. denied, 430 U.S. 911 _____ ______ (1977) with Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 81-85 (3d ____ _____ ___________________ Cir. 1983) (holding that unemployment compensation should not be deducted from a Title VII back pay award) and Brown v. A.J. ___ _____ ____ Gerrard Mfg. Co., 715 F.2d 1549, 1550-51 (11th Cir. 1983) (en ________________ banc) (similar) and EEOC v. Ford Motor Co., 688 F.2d 951, 952 ___ ____ _______________ (4th Cir. 1982) (similar). Three other circuits have shown signs  ____________________ 4NLRB v. Gullett Gin Co., 340 U.S. 361 (1951), frequently ____ _______________ cited in connection with the interplay between back pay and the collateral source rule, is simply not determinative on this issue. In Gullett Gin, the Court held that unemployment ____________ compensation need not be deducted from a back pay award under the National Labor Relations Act. Id. at 364. But the Court did not ___ furnish clear guidance as to whether the use of collateral benefits was categorically disallowed or merely entrusted to the trier's discretion. See 2 Dobbs, supra, 6.10(4), at 223-24; ___ _____ Thomas W. Lee, Comment, Deducting Employment Compensation and _______________________________________ Ending Employment Discrimination: Continuing Conflict, 43 Emory ______________________________________________________ L.J. 325, 326 (1994). 12 of an internal division. Compare Hawley v. Dresser Indus., Inc., _______ ______ ____________________ 958 F.2d 720, 726 (6th Cir. 1992) (approving the deduction of pension benefits from an ADEA back pay award) with Rasimas v. ____ _______ Michigan Dep't of Mental Health, 714 F.2d 614, 627 (6th Cir. _________________________________ 1983) (holding that "[u]nemployment benefits . . . should not be deducted from backpay awards" under Title VII), cert. denied, 466 _____ ______ U.S. 950 (1984); and compare Glover v. McDonnell Douglas Corp., ___ _______ ______ ________________________ 12 F.3d 845, 848 (8th Cir.) (holding that the district court erred in refusing to offset pension payments from an award of back pay), cert. denied, 114 S. Ct. 1647 (1994) with Doyne, 953 _____ ______ ____ _____ F.2d at 451-52 (contra);5 and compare Naton v. Bank of Cal., 649 ______ ___ _______ _____ ____________ F.2d 691, 700 (9th Cir. 1981) (holding that district courts possess discretion to deduct collateral benefits from back pay awards in ADEA cases) with Kauffman v. Sidereal Corp., 695 F.2d ____ ________ ______________ 343, 347 (9th Cir. 1982) (holding in a Title VII case that "unemployment benefits received by a successful plaintiff in an employment discrimination action are not offsets against a backpay award"). While we tend to agree with those courts that have held the interplay between collateral benefits and back pay to be a matter within the district court's discretion,6 we need not  ____________________ 5The Eighth Circuit recently noted this "possible conflict." Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1112 n.7 ________ ___________________________ (8th Cir.), cert. denied, 115 S. Ct. 355 (1994). _____ ______ 6In addition to the cases catalogued above, several trial- level cases in this circuit take the same position. See, e.g., ___ ____ Townsend v. Grey Line Bus Co., 597 F. Supp. 1287, 1293 (D. Mass. ________ _________________ 1984) ("The better view . . . is that the recovery of back pay under Title VII is an equitable remedy intended primarily to make 13 decide that precise question today. Even if we assume, arguendo, ________ that granting discretion to district courts to deduct collateral benefits from back pay awards is problematic, front pay presents an easier call. After all, the dispensation of front pay if only because of its relatively speculative nature, see Wildman, ___ _______ 771 F.2d at 616 is necessarily less mechanical than back pay, and the amount of front pay if only because of its predictive aspect is necessarily less certain than back pay, see Hukkanen, ___ ________ 3 F.3d at 286. For these reasons, front pay is much more heavily dependent than back pay upon the district court's exercise of its informed discretion.7 Consequently, whether or not courts possess the authority to tailor back pay awards to take collateral benefits into account a question that we leave open for the time being we are confident that they possess the authority to tailor awards of front pay in that manner. 2. The Nature of Equity. Beyond the relevant case 2. The Nature of Equity. ______________________  ____________________ the victim of discrimination whole."), aff'd, 767 F.2d 11 (1st _____ Cir. 1985); Thurber v. Jack Reilly's Inc., 521 F. Supp. 238, 242- _______ __________________ 43 (D. Mass. 1981) (exercising equitable discretion to deduct unemployment benefits from the plaintiff's back pay award), aff'd, 717 F.2d 633 (1st Cir. 1983), cert. denied, 466 U.S. 904 _____ _____ ______ (1984); see also Crosby v. New Eng. Tel. & Tel. Co., 624 F. Supp. ___ ____ ______ ________________________ 487, 491 (D. Mass. 1985) (predicting in an ADEA case that the First Circuit will likely allow district courts to exercise discretion in tailoring back pay awards to account for collateral benefits). 7To illustrate this point, we remind the reader that, while front pay is fully within the district court's discretion, back pay is a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case. Compare, e.g., _______ ____ Wildman, 771 F.2d at 615 with Costa v. Markey, 706 F.2d 1, 6 (1st _______ ____ _____ ______ Cir. 1982), cert. dismissed, 461 U.S. 920 (1983), and cert. _____ _________ ___ _____ denied, 464 U.S. 1017 (1983). ______ 14 law, our decision is informed by the nature of equity itself. In particular, the abstract imposition of a black-or-white rule regarding the relevance of collateral benefits, even if otherwise desirable, would simply not comport with the essential character and function of equitable discretion. And, though modern civil practice for the most part merges equity with law, equitable discretion remains a salient part of our legal system. See Ralph ___ A. Newman, Equity and Law: A Comparative Study 50-53 (1961); see ____________________________________ ___ also Roscoe Pound, Introduction to Newman, supra, at 10 ____ ____________ _____ (suggesting heightened importance of principles of equitable discretion "in applying legal precepts and remedies"). Historically, equity powers emerged in response to the rigidity of the common law, especially the impersonal generality of the remedies it afforded. See, e.g., Harold J. Berman, Law ___ ____ ___ and Revolution: The Formation of the Western Legal Tradition _________________________________________________________________ 518-19 (1983); Peter C. Hoffer, The Law's Conscience: Equitable _________________________________ Constitutionalism in America 8-16 (1990). As Lord Ellesmere put _____________________________ it: "The Cause why there is a Chancery is, for that Mens Actions are so divers and infinite, That it is impossible to make any general Law which may aptly meet with every particular Act, and not fail in some Circumstances." Earl of Oxford's Case, 21 Eng. _____________________ Rep. 485, 486 (1615). Hence, "[t]he Office of the Chancellor is . . . to soften and mollify the Extremity of the Law . . . ." Id. Because the hallmarks of equity have long been flexibility ___ and particularity, the imposition of a rigid rule, pro or con, concerning the interrelationship between collateral benefits and 15 front pay (an equitable remedy) would be incongruent with the historic and essential conception of equity. In contrast, a rule that confers latitude upon the district court to handle the interface between collateral benefits and front pay differently in different cases is fully consistent with this storied heritage. For these reasons, we conclude that the decision as to whether to tailor a front pay award to take into account collateral benefits is, and must be, within the equitable discretion of the nisi prius court. ____ _____ On much the same basis, we do not believe that this discretion is rigidly circumscribed by the source of the ______ collateral benefits.8 We consider the source of a collateral benefit to be informative, but not dispositive. That is to say, because the district court's decision about whether it should or should not tailor a front pay award to dovetail with certain collateral benefits is discretionary, we think it follows that  ____________________ 8The parties attach great significance to the source of the benefits. The Service argues that the collateral source rule is peculiarly inappropriate here because both the front pay and the collateral benefits emanate from the same source the federal government. Lussier sees no such special relationship. He advocates that we judge the parcel not by its wrapping, but, rather, by its contents, and asseverates that the post office is an independent entity distinct from other federal agencies, such as the Veterans Administration. In his view, therefore, the front pay and the collateral benefits do not derive from the same source, and there is all the more reason to apply the collateral source rule simpliciter. Since the district court's ___________ discretionary decision in this case is sustainable without regard to the source of the benefits, we need not decide the precise relationship between the post office and other parts of the federal apparatus. 16 the defendant's status as the source (or not) of the collateral benefit comprises, at the most, one factor of many within the mailbag of discretionary considerations. Here, too, the nature and function of equity jurisprudence guide our reasoning. To be sure, equity is not blind to the reality of events. The fact that the payer of damages and the dispenser of a collateral benefit are one and the same, or that they are linked in some economically meaningful sense, tends to make the deployment of the collateral source rule less attractive. See ___ Smith v. OPM, 778 F.2d 258, 263 (5th Cir. 1985) (suggesting that _____ ___ the collateral source rule may lack force "when the collateral source is the defendant"), cert. denied, 476 U.S. 1105 (1986); _____ ______ Enterprise Ass'n Steamfitters, 542 F.2d at 591 (similar); Olivas _____________________________ ______ v. United States, 506 F.2d 1158, 1163-64 (9th Cir. 1974) ______________ (similar); see also 2 Dobbs, supra, 8.6(2), at 491. It is ___ ____ _____ nonetheless easy to imagine scenarios in which the totality of equitable considerations favors the rule's strict invocation regardless of any affinity between payer and dispenser. To recognize a mechanical same-source exception to the rule would deny district courts the discretion to weigh these other considerations and, thus, would offend the logic of equity. Accordingly, we decline the parties' invitations to view the source of a collateral benefit, without more, as determinative of whether the benefit should be taken into account in fashioning a front pay award. B. Application of the Law. B. Application of the Law. ______________________ 17 Having surveyed the legal landscape, we now turn to the decision below. Though we review a district court's factual findings in a bench trial only for clear error, see, e.g., Reilly ___ ____ ______ v. United States, 863 F.2d 149, 163 (1st Cir. 1988); RCI _____________ ___ Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 201-02 ______________________ _________________ (1st Cir. 1987), we review its ultimate decision to impose or withhold equitable remedies for abuse of discretion. See, e.g., ___ ____ Shore, 42 F.3d at 377-78; Rosario-Torres v. Hernandez-Colon, 889 _____ ______________ _______________ F.2d 314, 323 (1st Cir. 1989) (en banc) (listing cases). In general, the abuse of discretion framework is not appellant- friendly. See Dopp v. Pritzker, 38 F.3d 1239, 1253 (1st Cir. ___ ____ ________ 1994) (predicting that most appeals from discretionary decisions of the district courts will come to naught). If we are to find an abuse of discretion, the appellant ordinarily must persuade us that the lower court "committed `a meaningful error in judgment.'" Rosario-Torres, 889 F.2d at 323 (quoting Anderson v. ______________ ________ Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).9 _____________  ____________________ 9At a more refined level, we have focused appellate review on the following considerations: In making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales. United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992). ______________ _______ Whether the district court's decision is viewed macroscopically or microscopically, however, the appellate focus is fundamentally the same. 18 In employment discrimination cases, the abuse-of- discretion standard is necessarily informed by the statutory purposes at stake. See, e.g., Albemarle Paper Co. v. Moody, 422 ___ ____ ____________________ _____ U.S. 405, 417 (1975); Enterprise Ass'n Steamfitters, 542 F.2d at _____________________________ 583 n.2. In mulling Title VII, the Court has distilled two primary purposes from the statute: the need to create and maintain a level, discrimination-free playing field and the need to make victims of discrimination whole. See McKennon v. ___ ________ Nashville Banner Publ. Co., 115 S. Ct. 879, 884 (1995); Albemarle __________________________ _________ Paper, 422 U.S. at 417-18. Thus, front pay awards must be _____ gauged, at least in part, against the twin goals of eradicating discrimination and ameliorating the harm that it has caused. See ___ Shore, 42 F.3d at 378; Thompson, 678 F.2d at 292. On this basis, _____ ________ then, investigating the soundness of any remedial award in a Title VII case entails two inquiries: (1) Does the district court's decision serve "to achieve equality of employment opportunity and remove barriers that have operated in the past to favor an identifiable group of . . . employees"? Griggs v. Duke ______ ____ Power Co., 401 U.S. 424, 429-30 (1971). (2) Does the district _________ court's decision serve "to make persons whole for injuries suffered on account of unlawful employment discrimination"? Albemarle Paper, 422 U.S. at 418. _______________ When addressed to the district court's front pay award, these queries yield no sign of discretion misused. Taking the inquiries in reverse order, the fit between the district court's action and the second of the two statutory objects compensation 19 cannot be gainsaid. The root purpose of the challenged offset is to prevent overcompensation and, thus, the district court's decision faithfully serves the goal of making the plaintiff whole. No more is exigible in this respect. See, e.g., Wyoming ___ ____ _______ Retirement Sys., 771 F.2d at 1431; Orzel, 697 F.2d at 756. _______________ _____ The district court's decision is also sufficiently in service to the first of the two statutory objects: deterrence. While any consideration that holds down the amount of a monetary judgment can be said to lessen the deterrent effect of that judgment, we believe that the relevant inquiry is broader in its scope. Deterrence is a function of degree, and nothing in the Rehabilitation Act or in the case law commands that it be maximized at all costs. This practical wisdom has particular force where, as here, maximizing deterrence might well interfere with the measured achievement of other statutory goals.10 Even short of maximization, the statutory purpose can be fully satisfied so long as deterrence is meaningfully achieved. Cf. ___ Navarro-Ayala v. Nunez, 968 F.2d 1421, 1427 (1st Cir. 1992) _____________ _____ (holding, in the context of Fed. R. Civ. P. 11, that a monetary  ____________________ 10We add that, as between the two primary statutory purposes, the goal of compensation, and not deterrence, is likely the more important in regard to front pay. After all, the basic function of a front pay award is to make victims of discrimination whole. See Wildman, 771 F.2d at 615; see also ___ _______ ___ ____ EEOC v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d 1166, 1173 ____ ___________________________________ (10th Cir.) (explaining that front pay "assur[es] that the aggrieved party is returned as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct"), cert. denied, 474 U.S. 946 (1985). For that reason, _____ ______ an abuse of discretion ordinarily will not lie when the trial court, in the process of making the plaintiff whole no more, no less happens to produce a marginal diminution of deterrence. 20 sanction aimed at deterrence is most appropriate "when the amount of the sanction falls within the minimum range reasonably required [effectively] to deter the abusive behavior"); Graefenhain, 870 F.2d at 1213 & n.9 (noting, in calculating front ___________ pay, that a court's "own vision of `optimal deterrence'" is not a sufficient basis "to engraft additional remedies on a statutory scheme which is predominantly compensatory"); Enterprise Ass'n ________________ Steamfitters, 542 F.2d at 592 (finding "no compelling reason of ____________ deterrence" that would justify "providing the injured party with double recovery for his lost employment"). Here, every indication is that the district court's award of front pay, handsome eventhough diminished,packs an adequatedeterrent effect. We add a postscript: viewing a front pay award in isolation for the purpose of measuring its contribution toward the goals of an antidiscrimination statute is risky business. A front pay award like any other single strand in a tapestry of relief must be assessed as a part of the entire remedial fabric that the trial court has fashioned in a particular case. See, ___ e.g., Barbano v. Madison County, 922 F.2d 139, 146 (2d Cir. 1990) ____ _______ ______________ (holding that the district court acted within its discretion in denying front pay entirely because other relief, including back pay, prejudgment interest, and attorneys' fees, sufficed to make the plaintiff whole). This holistic principle takes into account the fact that the finding of liability, in addition to setting the stage for relief and thereby furthering the goals of compensation and deterrence, itself sends a valuable 21 informational signal. See, e.g., McKennon, 115 S. Ct. at 885 ___ ____ ________ (explaining that the goals of an employment discrimination statute are advanced by a finding of discrimination because "disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important"). We sum up by remarking the obvious: decisions within the world of equity by their nature reflect judicial efforts to balance competing centrifugal and centripetal forces. In this instance, the district court struck an entirely reasonable balance between the goals of fair compensation and adequate deterrence. Mindful of the breadth of the district court's discretion in such matters, we affirm its decision to award front pay to the plaintiff, but to tailor the award to take into account the collateral VA benefits that he received as a result of his unlawful discharge.11 III. LATE-ARRIVING EVIDENCE III. LATE-ARRIVING EVIDENCE In general, the view that we take of the flexible interplay between front pay and the collateral source rule  ____________________ 11The Service complains that the lower court erred in figuring the amount of VA benefits used to reduce Lussier's front pay award. Because the factfinder's choice between two or more permissible views of the evidence cannot be deemed clearly erroneous, see Cumpiano v. Banco Santander P.R., 902 F.2d 148, ___ ________ _____________________ 152 (1st Cir. 1990), we reject this complaint (which, in any event, is anchored in an overly optimistic reading of the record) out of hand. 22 extends to CSRS benefits.12 Withal, the district court's handling of these benefits gives us pause. During the trial, reference was made to Lussier's eligibility for a CSRS disability retirement annuity. The government advanced a rough estimate of the monthly stipend that Lussier would likely receive. Dissatisfied with the trial evidence on this subject, the district court ordered "the parties to file within 30 days a status report concerning Lussier's application for CSRS disability benefits." Lussier I, 1994 WL _________ 129776, at *11. Lussier, though objecting vigorously to the directive, submitted some information anent interim payments. The Service offered no assistance. Eventually, the court reduced its planned front pay award based on the new information. Both parties appeal. Lussier contends that the entire enterprise was procedurally infirm; that the Service failed to prove the amount of any purported offset, thus rendering the issue moot; and, in all events, that the collateral source rule should have operated to disqualify the CSRS benefits from consideration in connection with the front pay award. For its part, the Service asseverates that the court erred in not using the estimate of CSRS benefits introduced at trial, or, alternatively, in not granting its Rule 59(e) motion and using the more precise figure limned therein.  ____________________ 12Lussier argues that CSRS benefits arise, at least in part, out of employee contributions, and, therefore, should not be treated in the same manner as other collateral benefits. We express no opinion on this aspect of the matter. Lussier can, of course, renew the argument before the district court on remand. 23 Since we give our stamp of approval to Lussier's first contention, we need not address the parties' other points. Typically, a district court's decision to reopen the record for the purpose of receiving additional evidence engenders an exercise of the court's discretion, reviewable for abuse of that discretion. See Zenith Radio Corp. v. Hazeltine Research, ___ __________________ ____________________ Inc., 401 U.S. 321, 331-32 (1971); Briscoe v. Fred's Dollar ____ _______ _____________ Store, Inc., 24 F.3d 1026, 1028 (8th Cir. 1994); Natural ____________ _______ Resources Defense Council, Inc. v. Texaco Ref. & Mktg., Inc., 2 _______________________________ __________________________ F.3d 493, 504 (3d Cir. 1993); Hartford Accident & Indem. Co. v. ______________________________ Gulf Ins. Co., 837 F.2d 767, 773 (7th Cir. 1988). This rule ______________ pertains even when the district court opts to reopen the record on its own initiative. See, e.g., Calage v. University of Tenn., ___ ____ ______ ___________________ 544 F.2d 297, 301-02 (6th Cir. 1976) (upholding district court's sua sponte solicitation and consideration of post-trial ___ ______ evidentiary submissions in employment discrimination suit); see ___ also Briscoe, 24 F.3d at 1028. Here, however, the district court ____ _______ despite what it said did not reopen the record; instead, the court, over the plaintiff's objection, engaged in a unilateral pursuit of additional evidence without affording the parties the standard prophylaxis that generally obtains at trial.13 While we do not doubt the court's good intentions the judge was clearly motivated by concerns of judicial economy and a desire to  ____________________ 13These protections include, but are not limited to, the right to object to evidence, the right to question its source, relevance, and reliability, the right to cross-examine its proponent, and the right to impeach or contradict it. 24 be fair to all parties it chose a mode of evidence-gathering that offends accepted practice and contradicts existing law. Therefore, we must sustain Lussier's preserved objection to it. And, moreover, because the error affected substantial rights  the court used the extra-record information anent interim payments to reduce the amount of the front pay award the judgment must be vacated. We explain briefly. It is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts. A good illustration of this precept in operation can be found in the realm of judicial notice. Under Fed. R. Evid. 201(b), a judge may take notice of an adjudicative fact only if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Courts have tended to apply Rule 201(b) stringently and well they might, for accepting disputed evidence not tested in the crucible of trial is a sharp departure from standard practice. Hence, in Cooperativa de Ahorro y _________________________ Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269 (1st Cir. ______________ ______________________ 1993), petition for cert. filed (U.S. Oct. 12, 1993) (No. 93- _________________________ 564), we held that the district court exceeded the bounds of Rule 201(b) by gleaning information supposedly known "within institutional investment circles" from financial periodicals that were not offered into evidence. See id. at 272-73; see also Barr ___ ___ ___ ____ ____ 25 Rubber Prods. Co. v. Sun Rubber Co., 425 F.2d 1114, 1125-26 (2d _________________ ______________ Cir.) (stating similar legal tenets), cert. denied, 400 U.S. 878 _____ ______ (1970). In this case, the court's acquisition of extra-record information by special delivery is similarly beyond the pale. Its actions cannot be justified under the first furculum of Rule 201(b). Facts that are "generally known within the territorial jurisdiction of the trial court" are those that exist in the unrefreshed, unaided recollection of the populace at large. See ___ 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice ________________ and Procedure 5105, at 489 (1977). Though a court, under this _____________ rubric, may take judicial notice of such varied matters as the "traditional features of a snowman," Eden Toys, Inc. v. Marshall _______________ ________ Field & Co., 675 F.2d 498, 500 n.1 (2d Cir. 1982), or the ____________ popularity of certain reusable containers, Price Food Co. v. Good ______________ ____ Foods, Inc., 400 F.2d 662, 665 (6th Cir. 1968), or the _____________ impossibility of driving from one place to another in a specified period of time, United States v. Baborian, 528 F. Supp. 324, 332 _____________ ________ (D.R.I. 1981), it is pellucid that the facts surrounding the interim CSRS payments the amount received, how the amount was derived, its significance in relation to the likely size of Lussier's disability retirement annuity, and the relevance (if any) of the interim benefits to front pay never achieved the requisite level of popular familiarity. By like token, the evidence also fails to satisfy the 26 second branch of Rule 201(b). Court records aside,14 some government documents are subject to judicial notice (albeit under certain limited conditions) on the ground that information contained therein is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See, e.g., Massachusetts v. Westcott, 431 U.S. 322, ___ ____ _____________ ________ 323 n.2 (1977) (per curiam) (taking judicial notice of fishery licenses as reflected in the records of the Coast Guard's Merchant Vessel Documentation Division). The information here at issue does not reach this safe harbor. In the first place, the information is not contained in generally available government records. Second, the court did not acquire it by direct resort to any public record, but, rather, through untested unilateral ___ submissions. Third, a monetary figure affecting a plaintiff's ultimate award, even though eventually quantifiable, seems to us to be the sort of disputed adjudicative fact for which the adversarial truth-finding process is well suited. And, finally, the court gave the parties no real opportunity to address or counter the gleaned evidence.15  ____________________ 14Because courts may take judicial notice of their own records and the records of sister tribunals under a special set of rules, see generally 21 Wright & Graham, supra, 5106, at ___ _________ _____ 256-57 (Supp. 1994), we exempt court documents from this discourse. 15Westcott forms an interesting contrast to this case. ________ There, in addition to the qualitative differences in the information sought and in the data source upon which the court relied, "[t]he parties were given an opportunity to comment on the propriety of [the Court's] taking notice of the license, and both sides agreed that [the Court] could properly do so." 433 U.S. at 323 n.2. Neither of these conditions obtains here. 27 Ours is a system that seeks the discovery of truth by means of a managed adversarial relationship between the parties. If we were to allow judges to bypass this system, even in the interest of furthering efficiency or promoting judicial economy, we would subvert this ultimate purpose. As Rule 201(b) teaches, judges may not defenestrate established evidentiary processes, thereby rendering inoperative the standard mechanisms of proof and scrutiny, if the evidence in question is at all vulnerable to reasonable dispute. Here, the district court failed to steer by this beacon. There is no indication, despite the court's contrary characterization,16 that the record was actually reopened or that the parties were afforded anything approximating the evidentiary and procedural guarantees to which they were entitled. Similarly, there is no basis for finding that the parties waived this deprivation, consented to the court's shortcut, or otherwise invited judicial reliance on the extra- record "proof." To the extent that the judgment is premised on this late-arriving evidence, it cannot stand.  ____________________ 16The district court paid lip service to the principle we have discussed, writing that it had "reopened the record." But the parties agree that no actual reopening occurred, and calling what the court did a "reopening" does not make it so. Cf. ___ Siegfriedt v. Fair, 982 F.2d 14, 19 (1st Cir. 1992) ("With Juliet __________ ____ we ask `What's in a name?' and with her we conclude `[t]hat which we call a rose by any other name would smell as sweet.'") (quoting William Shakespeare, Romeo and Juliet act 2, sc. 2). ________________ 28 Accordingly, we vacate the judgment and remand.17 We neither dictate how the district court should proceed on remand nor restrict its range of options. For instance, without limiting the generality of the foregoing, the court may in its discretion choose to reopen the record fully for the purpose of obtaining more information about Lussier's CSRS benefits, and, if the court follows that path, it can then decide what, if any, use to make of the new evidence. Alternatively, the court may, if it so elects, hold the parties to their proof at trial and determine the front pay award on the existing record. IV. CONCLUSION IV. CONCLUSION We have reached the point at which neither snow, nor rain, nor heat, nor gloom of night, nor any lingering unresolved issue impedes the delivery of our judgment. Thus, we need go no further. We hold that the adjustment of a front pay award under the Rehabilitation Act of 1973 to take collateral benefits into account is within the equitable discretion of the district court; and that, in this case, the court, by choosing to account for collateral benefits in fashioning such an award, did not abuse  ____________________ 17We neither overlook nor condone the Service's cavalier disregard of the district judge's request for status reports. Had the judge scrapped the proposed offset as a sanction for uncooperative behavior, a different issue would confront us. Cf. ___ R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 19-20 & n.9 _________________ _________________ (1st Cir. 1991). Here, however, the judge did not purpose to sanction the Service but instead decided a hotly disputed issue in the case based partly on extra-record information. As we have indicated on other occasions, even when a party is guilty of "lollygagging that a district court should not have to tolerate, two wrongs seldom make a right." Id. at 20. ___ 29 its discretion. But because the court, in calculating a particular offset, relied on evidence dehors the record, we ______ vacate the judgment and remand for further proceedings relating to that offset. Affirmed in part, vacated in part, and remanded. Each Affirmed in part, vacated in part, and remanded. Each ________________________________________________ ____ party shall bear his own counsel fees and costs in regard to party shall bear his own counsel fees and costs in regard to _________________________________________________________________ these appeals. these appeals. _____________ 30