UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 98-1300

JACQUELYN M. QUINT,

Plaintiff, Appellee,

v.

A.E. STALEY MANUFACTURING COMPANY,

Defendant, Appellant.

No. 98-1342

JACQUELYN M. QUINT,

Plaintiff, Appellant,

v.

A.E. STALEY MANUFACTURING COMPANY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]

Before

Torruella, Chief Judge,

Cyr, Senior Circuit Judge,

and Stahl, Circuit Judge.

Brent A. Singer, with whom John W. McCarthy and Rudman & Winchell,
LLC were on brief for appellant A.E. Staley Manufacturing Company.
Stephen A. Roach, with whom Darren G. Waggoner, Adam P. Whitney and
Roach & Wise were on brief for appellee Quint.

March 15, 1999

CYR, Senior Circuit Judge. Defendant A.E. Staley
Manufacturing Company ("Staley") appeals from a district court
judgment awarding Jacquelyn Quint $300,000 in damages for having
discharged her in violation of the Americans with Disabilities Act
(ADA). Quint in turn cross-appeals from the judgment insofar as it
disallowed all but $8,019 in back pay and rejected her request for
reinstatement.
I
BACKGROUND
In December 1991 Quint went to work at Staley's potato-
starch processing plant in Houlton, Maine, initially as a warehouse
worker and later as a press operator. In the latter position she
manually lifted objects weighing from 70 to 100 pounds (e.g., bags
of starch, propane tanks), manipulated heavy machinery parts (e.g.,
metal covers), and performed a variety of repetitive manual or
overhead tasks (e.g., stenciling bags, sweeping, shoveling, and
adjusting spigots). Staley's automated manipulators, designed to
relieve workers from heavy manual lifting, either functioned
haphazardly or in some instances were inoperable. The work area
was unheated and open to the outdoors both in winter and summer. 
Quint consulted Dr. Hassan Abouleish in February 1993,
complaining of wrist pain. Dr. Abouleish referred her to a
neurologist, Dr. Jose Tungol, who performed nerve-conduction tests
and diagnosed Quint with bilateral carpal tunnel syndrome (CTS). 
CTS is a condition in which the median nerves and nerve tendons
which pass through the carpal tunnel a narrow, finger-width
passageway through the wrist bone become compressed and
inflamed, causing numbness or pain. Commonly, CTS is caused by
repetitive, vibratory, or forceful use of the hands, or by exposure
of the hands to prolonged elevation or extreme cold. Dr. Abouleish
and Dr. Tungol recommended that Quint wear supportive wrist splints
at night and that she be relieved from work tasks which would
aggravate her condition, such as lifting objects weighing more than
five or ten pounds.
On May 21, 1993, Quint notified Staley of the medical
diagnosis and restrictions recommended by Dr. Abouleish. Staley
directed Quint to see Dr. Richard Blum, a general practitioner whom
Staley employed as its company physician. After interviewing
Quint, but without performing a physical examination, Dr. Blum
recommended a less restrictive lifting limit of from 20 to 25
pounds, as well as continued nighttime use of wrist splints. 
Notwithstanding Dr. Blum's medical advice, Staley continued to
require Quint to perform all regular work duties during the next
two months. 
In July 1993, Staley arranged for a neurologist and CTS
specialist, Dr. Bruce Sigsbee, to examine Quint. Dr. Sigsbee
confirmed that Quint did indeed have work-related CTS, and
recommended that Staley reduce her repetitive work tasks and abide
by a maximum ten-pound lifting restriction. When Plant Manager
Kevin Baker read the Sigsbee report he became "very upset." Fearing
that Quint would spoil Staley's spotless workplace-safety record
were she to file a workers' compensation claim, Baker ordered the
production of a videotape purportedly depicting the work tasks
typically performed by a press operator, but seriously downplaying
the physical demands of the position. Baker then unsuccessfully
lobbied Dr. Sigsbee to alter his report, and made what Dr. Sigsbee
characterized as "strident" accusations that Quint was malingering. 
For her part, Quint balked at Baker's suggestion that she go on
sick leave.
Following the Sigsbee report, Staley adjusted Quint's job
description so as to require her to perform only "lighter" duties
on the processing line. Because processing-line operators normally
worked in teams of three or four, Staley ordered other members of
Quint's team to take up the heavier or more repetitive tasks. 
Without consulting Quint's doctors, Baker ordered her to wear her
wrist splints on the job, which caused the metal brace in the
splints to bruise her wrists and ultimately to radiate pain into
her elbows and shoulders.
After Dr. Blum saw Quint again in September 1993, he
announced his intention to visit the job site to determine how best
to accommodate her CTS. Keith Saunders, Staley's operations
manager, rejected Quint's request that she be allowed to accompany
Dr. Blum on the job-site visit. Around the same time, Staley's
insurer retained an ergonomist to study the press-operator position
and recommend suitable accommodations. As a consequence, Staley
ultimately modified some of its procedures and equipment. For
example, it altered the design of the so-called "cane" used to
adjust spigots, and installed electric winches to lift heavy
machinery covers. At the same time, it decided against heating the
work area, realigning the conveyor belts or repairing the automated
manipulators. 
In October 1993, Dr. Sigsbee again examined Quint. 
Without conducting new nerve-conduction tests, he opined that her
CTS was "substantially improved," and increased her weightlifting
restriction to thirty pounds. Gradually, Staley began to increase
Quint's job functions, reinstating her "bagging" duties (i.e.,
lifting and handling 100-pound bags of starch). When Quint
reported increased wrist pain, Saunders told her that only Dr. Blum
could order her back to "light" duty.
In December 1993, Dr. Tungol performed new nerve-
conduction tests and reported overall improvement in Quint's
condition, but warned that "[a] return to this activity [i.e., her
regular duties] will make her vulnerable to reoccurrence of her
symptoms." At year's end, Quint informed Saunders that her wrist
pain had increased since November, when he had reinstituted her
"bagging" responsibilities.
In early January 1994, Quint consulted Dr. David
Starbuck, who notified Staley that Quint's CTS had flared up and
that she should not work until further notice. At 3:15 p.m. on
January 7, Baker ordered Quint to travel to Dr. Blum's office 
located some 30 miles from her home for a 3:30 p.m. appointment. 
Saying that she needed "reasonable notice," Quint declined to do so. 
Ultimately, Dr. Blum concluded that Quint could continue to perform
the light-duty job, and Baker denied her request for sick leave,
instead stating that Quint could either return to work or be fired. 
Quint complied and returned to her light-duty job.
By February 1994, however, Staley again reinstituted her
"bagging" duties and Quint soon complained to Baker of worsening
wrist pain and numbness. Baker nonetheless declined to consult
further with Dr. Blum. On February 28, Quint consulted Dr. Jean
LaBelle, a hand surgeon. After conducting tests, Dr. LaBelle
reported that Quint's CTS was worsening, and recommended to Staley
that she take at least six weeks off from work. 
On Friday, March 4, after four days without any attempt
to contact Quint, Baker ordered Saunders to send Quint a certified
letter pursuant to Me. Rev. Stat. Ann. tit. 39-A, 207, notifying
her that she must submit to a medical examination by Dr. Blum on
Monday, March 7, and then report to Baker's office the following
day to discuss the results of Dr. Blum's report. Quint did not
receive the certified letter until Saturday afternoon. Although
the letter informed Quint that she had the statutory right to
require Staley to pay her physician to attend the Blum examination,
Baker and Saunders knew before the letter was mailed that Dr.
LaBelle was away on vacation and unable to attend. In addition,
the letter failed to advise Quint that she had the right to
reschedule the appointment.
Plant Manager Baker conceded at trial that he had given
no thought to whether the certified-letter notice was unreasonably
short and that he had simply not expected that Quint might wish to
exercise her legal right to have her own doctor accompany her, even
though Baker knew from past experience that Quint mistrusted Dr.
Blum. For his part, however, Operations Manager Saunders
acknowledged that the timing of the notice was unreasonable. 
On Monday, March 7, Quint called Dr. Blum's office to
cancel the appointment. The doctor's office promptly notified
Baker the same day, adding that Quint had seemed "quite upset." 
Since the certified letter had stated that the purpose of the March
8 meeting at Baker's office had been to discuss the Blum medical
report, Quint did not attend. Finally, on Wednesday, March 9,
Baker fired Quint for failing to notify Staley of the reason for
canceling the Blum appointment and for failing to attend the
Tuesday follow-up meeting at Baker's office.
In due course Quint brought suit against Staley in
federal district court, claiming inter alia that her discharge
violated the ADA, 42 U.S.C. 12101 et seq., the Family Medical
Leave Act (FMLA), 29 U.S.C. 2611 et seq., and the Maine Human
Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5, 4551. Following
a five-day trial, the jury found that Staley had discharged Quint
because of her disability, and awarded her $300,000 in compensatory
damages and $420,000 in punitive damages. The district court
reduced the damages award to $300,000 pursuant to the statutory
cap. See 42 U.S.C. 1981a(b)(3).
Following a hearing on equitable relief, the district
court disallowed all but $8,019 of Quint's $125,580 back-pay claim,
largely because she admittedly failed to apply for other jobs after
her discharge. Thus, the court held that she had not exercised
reasonable diligence to mitigate her back-pay damages. See id. 
2000e-5(g)(1). Concluding that with due diligence Quint could have
obtained another job by August 1995, the court awarded $45,917 in
back pay for the initial 18-month period only dating from March
1994 through August 1995 and disallowed all back pay for the
period from August 1995 to the date of judgment ($79,663). It then
reduced the $45,917 back-pay award by $37,898, representing the
total amount Quint had received following her discharge in the form
of disability insurance, AFDC benefits and food stamps.
The district court further found that it would be
impracticable to reinstate Quint to her former job because there
were no currently available "light-duty" positions for which she
could qualify, and because ill feelings persisted between Quint and
her former coworkers. The court denied a front-pay award, on the
ground that the $308,019 awarded in damages and back pay afforded
ample compensation. Finally, it awarded Quint $1,000 on her MHRA
claim. Staley now appeals the $300,000 damages award and Quint
cross-appeals from the order denying her request for full back pay
and reinstatement.

II
DISCUSSION
A. The Staley Appeal (No. 98-1300)
1. Exhaustion of Arbitral Remedies
First, Staley claims that the district court should have
dismissed the complaint because Quint disregarded the requirement
in the governing collective bargaining agreement (CBA) that
employees submit all employment disputes to arbitration. See CBA,
Art. 5 & 6 (June 15, 1991); Gilmer v. Interstate/Johnson Lane
Corp., 500 U.S. 20, 35 (1991) (holding that employee who
voluntarily executed an employment contract containing broad
arbitration clause waived right to bring employment-discrimination
lawsuit); supra note 2. 
Following oral argument in the case presently before us,
the United States Supreme Court definitively rejected the very
contention here advanced by Staley, thereby resolving a circuit
split. See Wright v. Universal Maritime Serv. Corp., 119 S. Ct.
391, 397 (1998) (holding that CBA arbitration clause which did not
clearly and unmistakably waive employees' rights under federal
anti-discrimination statute did not waive employee's right to sue). 
Thus, in the present case, CBA Articles 5 & 6, neither of which
explicitly mentions employee rights under the ADA or any other
federal anti-discrimination statute, pose no bar to the instant
action.
2. The Rule 50(b) Motion
Staley contends that it was entitled to judgment as a
matter of law because Quint did not establish that bilateral CTS is
a cognizable "disability" under the ADA. See Fed. R. Civ. P. 50(b). 
We review the denial of the Rule 50(b) motion de novo, viewing all
evidence and resolving all credibility questions in the light most
favorable to Quint. See Ansin v. River Oaks Furniture, Inc., 105
F.3d 745, 753 (1st Cir.), cert. denied, 118 S. Ct. 70 (1997). We
will not reverse unless it is determined that no rational jury
could have returned such a verdict.
The ADA prohibits employers from discriminating "against
a qualified individual with a disability because of the disability
of such individual." 42 U.S.C. 12112(a). A "disability" is
defined as, inter alia, "a physical . . . impairment that
substantially limits one or more of the major life activities of
such individual." Id. 12102(2)(A) (emphasis added). The EEOC
regulations themselves define "physical impairment" as "[a]ny
physiological disorder, or condition . . . affecting one or more of
the following body systems: neurological, musculoskeletal, [etc.]." 
29 C.F.R. 1630.2(h)(1) (emphasis added).
Quint's medical expert testified that she suffered, interalia, from bilateral CTS, irritated ulnar nerves, and arm/shoulder
syndrome, all of which readily qualify as "physical impairments." 
Quint alleged that her physical impairment adversely affected three
major life activities: lifting, caring for herself, and working. 
As we conclude that she adduced sufficient evidence that her
physical impairments substantially affected her ability to work,
see infra; 29 C.F.R. 1630.2(1) ("Major life activities" means
"functions such as . . . working"), we need not consider her further
claims that lifting may constitute a distinctly cognizable "major
life activity," compare Brief for Appellant at 12 n.11, with 29
C.F.R. Pt. 1630, App. 1630.2(i) (expressly identifying "lifting"
as a distinct "major life activit[y]"), and that she adduced
sufficient evidence regarding the effect her CTS had on her
nonoccupational capacities to care for herself and to lift.
The principal dispute on appeal relates to the
"substantial limitation" element. EEOC regulations define
"substantially limits" as "(i) [u]nable to perform a major life
activity that the average person in the general population can
perform; or (ii) [s]ignificantly restricted as to the condition,
manner or duration under which an individual can perform a
particular major life activity as compared to the condition,
manner, or duration under which the average person in the general
population can perform that same major life activity." 29 C.F.R.
1630.2(j)(1). Among the considerations pertinent to the
"substantial limitation" element are "(i) [t]he nature and severity
of the [physical] impairment; (ii) [t]he duration or expected
duration of the impairment; and (iii) [t]he permanent or long term
impact, or the expected permanent or long term impact of or
resulting from the impairment." Id. 1630.2(j)(2).
Staley insists that Quint failed to establish an existing"substantial limitation," because at best her medical doctors'
forecasts that she could not lift more than ten pounds were
evidence of a predisposition to future serious injury. See 29
C.F.R. Pt. 1630, App. 1630.2(h) (mere "predisposition to illness"
cannot be an ADA disability). At bottom, then, Staley faults
Quint's medical experts for failing to perform actual weightlifting
tests by requiring her to lift progressively heavier objects. 
Staley neither cites apposite authority for its position
nor to our knowledge has any court held that ADA plaintiffs mustundergo actual physical assessments of their respective capacities
to engage in particular major life activities in order to establish
that their ability to do so is limited. On the contrary, through
competent medical testimony an ADA plaintiff may demonstrate that
her own preemptive decision to limit or refrain from a major life
activity was necessary to avoid placing herself or others at
imminent risk of physical injury. See, e.g., Bragdon v. Abbott,
118 S. Ct. 2196, 2206 (1998) ("The Act addresses substantial
limitations on major life activities, not utter inabilities. 
Conception and childbirth are not impossible for an HIV victim but,
without doubt, are dangerous.") (emphasis added).
Tellingly, Staley's own medical expert actually relied on
this predictive methodology in assessing Quint's condition. 
Likewise, commonsense dictates that an ADA claimant may rely on the
preemptive risk assessments made by her medical experts, subject of
course to later cross-examination regarding their methodology and
their personal knowledge of the relevant medical history. In that
very vein the jury found the assessments offered by Quint's expert
witnesses to be creditworthy. See Criado v. IBM Corp., 145 F.3d
437, 440-41 (1st Cir. 1998) (on Rule 50(b) motion, all credibility
issues are resolved in nonmovant's favor).
Staley further argues that Quint simply showed that her
CTS resulted from a temporarily "irritated" median nerve, rather
than from permanent nerve "damage." Thus, she failed to show that
her impairment entailed any "permanent or long term impact." See
supra note 5. Once again, we cannot agree.
Quint adduced competent evidence that her carpal nerve
irritation was both recurrent and permanent. Dr. LaBelle testified
that "the moment [Quint] starts using her hands [] the [seriousness
of her CTS] will rise right up immediately like that . . . . It's
very seldom that a tendinitis that occurs that flares up to a level
that she had it will ever revert back to normal." Similarly, Dr.
Sigsbee testified that in July 1993 he concluded that Quint
"probably would not be able to perform that kind of [heavy-duty]
work ever again in the future." In December 1993, Dr. Tungol
likewise warned that "[a] return to this activity [i.e., her former
duties, such as "bagging,"] will make [Quint] vulnerable to
reoccurrence of her symptoms." Moreover, no medical doctor, except
non-CTS-specialist Dr. Blum, ever cleared Quint to return to her
regular duties. Cf. Wilmarth v. City of Santa Rosa, 945 F. Supp.
1271, 1276 (N.D. Cal. 1996) (finding plaintiff's CTS "temporary,"
hence not an ADA disability, where she "was cleared by her doctors
to return to full clerical duties"); Fink v. Kitzman, 881 F. Supp.
1347, 1377 (N.D. Iowa 1995) (no ADA disability where plaintiff
"offered no evidence whatsoever as to whether her [CTS] can be
expected to improve, continue, or deteriorate"). Thus, credited by
the jury as we must deem it to have been, see Criado, 145 F.3d at
440-41, the medical evidence presented by Quint provided ample
support for a factual finding that her impairment was not merely
transitory. Cf. id. (rejecting defendant's contention that jury
was compelled to find that plaintiff's impairment was "a temporary
mental condition").
An ADA claimant assumes a more fact-specific burden of
proof in attempting to demonstrate that her impairment
"substantially limits" the major life activity of "working." In the
context of the major life activity of working, the term
"substantially limits" means "significantly restricted in the
ability to perform either a class of jobs or a broad range of jobs
in various classes as compared to the average person having
comparable training, skills and abilities. The inability to
perform a single, particular job does not constitute a substantial
limitation in the major life activity of working." 29 C.F.R. 
1630.2(j)(3)(i) (emphasis added). Other relevant factors include:
"(A) [t]he geographical area to which the individual has reasonable
access; (B) [t]he job from which the individual has been
disqualified because of an impairment, and the number and types of
jobs utilizing similar training, knowledge, skills or abilities,
within that geographical area, from which the individual is also
disqualified because of the impairment (class of jobs); and/or (C)
[t]he job from which the individual has been disqualified because
of an impairment, and the number and types of other jobs not
utilizing similar training, knowledge, skills or abilities, within
that geographical area, from which the individual is also
disqualified because of the impairment (broad range of jobs in
various classes)." Id. 1630.2(j)(3)(ii) (emphasis added).
In regard to the geographical/job class element, Quint
established that her CTS restrictions did more than merely
disqualify her for a particular job at Staley. Cf., e.g., Dutcherv. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995) (no ADA
disability where arm injury prevented plaintiff from performing
only the small subset of welding assignments requiring her to
climb); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir.
1994) (no ADA disability where asthma merely prevented plaintiff
from working in hospital blood bank); Shpargel v. Stage & Co., 914
F. Supp. 1468, 1474 (E.D. Mich. 1996) (no ADA disability where CTS
simply prevented plaintiff from working more than eight hours a
day). The inability to lift heavy objects and perform repetitive
manual tasks can translate across a broad spectrum of physically
demanding jobs. See, e.g., Cochrum v. Old Ben Coal Co., 102 F.3d
908, 911 (7th Cir. 1996) ("The physical restrictions Cochrum's
physician placed upon him no overhead work, heavy lifting, or
pulling and pushing out from his body might apply to a broad
range of jobs, and are more than job specific."). Moreover, in the
geographical area where Quint resides, physically demanding jobs
are an economic mainstay. In this vein, Quint testified without
contradiction that she had held a variety of jobs entailing manual
labor prior to her employment at Staley, ranging from potato
harvesting in twelve-hour shifts, to house cleaning and house
painting.
Moreover, she adduced corroborative expert testimony. 
Cf. Helfter v. UPS, Inc., 115 F.3d 613, 617-18 (8th Cir. 1997)
(plaintiff with CTS adduced no evidence concerning "various classes
[of jobs] within a geographical area to which she has reasonable
access," other than her own conclusory statements about her job
prospects); Crumpton v. St. Vincent's Hosp., 963 F. Supp. 1104,
1113 (N.D. Ala. 1997) (plaintiff adduced only her conclusory
deposition testimony that she was disabled from all institutional-
cooking jobs in her geographical area). Thus, on cross-examination
Dr. Sigsbee acknowledged that Quint's CTS and the attendant lifting
restrictions "probably preclude a lot of physical jobs," and that
"there are a lot of physical jobs in Maine." Nor did Staley raise
contemporaneous objection to Dr. Sigsbee's expert qualifications
regarding Maine vocations. Furthermore, Dr. Sigsbee's
deficiencies in this subject matter area are far from self-evident,
since he had practiced in northern and southern Maine for
approximately seventeen years, and his specialization in CTS
presumably afforded him adequate exposure to the impact of CTS upon
in-state job prospects.
Nor is the burden of proof incumbent upon an ADA
plaintiff in relation to this element particularly formidable. See29 C.F.R. Pt. 1630, App. 1630.2(j) ("The terms 'numbers and types
of jobs' and 'number and types of other jobs,' as used in the
factors discussed above, are not intended to require an onerous
evidentiary showing. Rather, the terms only require the
presentation of evidence of general employment demographics and/or
of recognized occupational classifications that indicate the
approximate number of jobs (e.g., 'few,' 'many,' 'most') from which
an individual would be excluded because of an impairment."); supranote 4. Since all genuine credibility issues must be resolved in
plaintiff's favor, see Ansin, 105 F.3d at 753, Dr. Sigsbee's
testimony alone, which came in without objection, sufficed to
generate a triable issue of fact.
In addition, Quint adduced competent evidence that her
training, knowledge, skills a high school education and a work
history of heavy physical labor likely would restrict her to
such jobs, which were also the most prevalent in her geographical
area. Compare Garza v. Abbott Lab., 940 F. Supp. 1227, 1236 (N.D.
Ill. 1996) (plaintiff proved that her "education, skills, and work
experience qualify her for clerical, secretarial, and retail
positions," and that CTS disabled her from doing "a wide variety of
work related activities," including typing), with McKay v. Toyota
Motor Mfg., U.S.A., 110 F.3d 369, 371 (6th Cir. 1997) (finding no
ADA "disability" where CTS-afflicted plaintiff was fired from an
assembly-line job, but she was a college graduate who was pursuing
her teaching certificate at the time of her discharge). 
Finally, Staley cites several decisions purportedly
holding that "mild" CTS cannot, as a matter of law, qualify as an
ADA "disability". On close inspection, however, these authorities
simply hold that the respective ADA claimants had not established
that CTS substantially limited their particularized job prospects. 
The ADA explicitly contemplates that the "disability" determination
is to be made by the factfinder on an individualized, case-by-case
basis. See 42 U.S.C. 12102(2)(A) (defining "disability" as "a
physical . . . impairment that substantially limits one or more of
the major life activities of such individual") (emphasis added).
On appeal from a judgment entered pursuant to Rule 50(b),
we do not consider which party put forth the more convincing case,
but whether the party with the burden of proof adduced enough
evidence to enable a rational jury to return a verdict in her
favor. As Quint met the required evidentiary threshold, we must
affirm the liability verdict.
3. Damages
Staley next contends that the compensatory and punitive
damages awards were excessive. The jury awarded Quint $300,000 in
compensatory damages, see McKinnon v. Kwong Wah Restaurant, 83 F.3d
498, 506-07 (1st Cir. 1996) (amended ADA makes emotional harm
compensable), and, based on Staley's annual net income of $65-85
million, $420,000 in exemplary damages. The district court reduced
the combined award to $300,000 pursuant to the statutory cap in 42
U.S.C. 1981a(b)(3)(D). Staley argues that the jury rationally
could not have awarded Quint $300,000 in compensatory damages since
she established no serious emotional injuries stemming from her
discharge. Be that as it may, since we find the punitive damages
award itself proper, and it alone exceeded the $300,000 statutory
cap, there is no need to revisit the compensatory-damages issue. 
See Hogan v. Bangor and Aroostook R.R. Co., 61 F.3d 1034, 1037 (1st
Cir. 1998).
An ADA plaintiff may recover punitive damages provided
she establishes, inter alia, that the defendant engaged in a
discriminatory practice "with reckless indifference to the
[plaintiff's] federally protected rights." 42 U.S.C. 
1981a(b)(1)(emphasis added). Staley contends that the only
evidence of reckless indifference was its short notification of the
March 7, 1994 appointment with Dr. Blum and of Quint's right to
require Staley to compensate her doctor for attending the
appointment. Staley argues that since these rights arise under
Maine law, see Me. Rev. Stat. Ann. tit. 39-A, 207, supra note 1,
rather than the ADA, Staley's belated notification cannot as a
matter of law establish its reckless indifference to a "federallyprotected right[]." We reject its claim, since the ADA accorded
Quint the right to be free from discharge on account of her
disability and there was ample evidence that Staley discharged her
with reckless indifference to that "federally protected right[]. 
In July 1993, Plant Manager Baker became "upset" about Dr.
Sigsbee's diagnosis of Quint's disability and its potential adverse
effect on Staley's spotless workers' compensation record. Baker
"strident[ly]" asserted that Quint was malingering, exerted pressure
on Dr. Sigsbee to alter his diagnosis, and produced a videotape
which misleadingly understated the job-duty requirements of a
press-operator.
In early January 1994, when Quint's physician recommended
that she not work at all, Baker made the decision to refer Quint to
Dr. Blum, who had consistently downplayed her impairment. Yet
Baker gave Quint a mere fifteen minutes' notice of the appointment
and rejected her physician's recommendation that she cease work
until further notice.
Moreover, Operations Manager Saunders testified that the
certified-mail notice Baker had given Quint of the later March 7,
1994 appointment with Dr. Blum, see supra Section I, was
unreasonably short. Importantly, Baker himself conceded at trial
that he had given no thought to whether the notice was reasonable,
which itself fairly may be considered a clear acknowledgment of
reckless indifference. Baker also knew that Dr. LaBelle, Quint's
physician, could not be available on March 7 because he was away on
vacation. Nevertheless, after learning that Quint was "upset" and
that she had canceled the March 7 appointment, Baker reacted by
terminating her employment for failing to comply with the
unreasonable certified-mail notice she had been given.
In addition, contrary to Staley's contention the fact
that the March 5, 1994 notice violated Maine law in no sense
precluded a punitive damages award under the ADA. Section
1981a(b)(1) does not state "with reckless indifference to the
[plaintiff's] federally protected rights, and only those federallyprotected rights." Thus, the jury rationally could conclude that
Baker recklessly utilized Quint's alleged "insubordination" as an
excuse for discharging her by reason of her disability.
Finally, Staley neither suggests another rationale which
would preclude a finding that the totality of Staley's conduct was
"outrageous," nor challenges the punitive damages calculation
itself. Accordingly, the $420,000 punitive damages award alone
afforded ample support for the $300,000 damages award approved by
the district court.
B. The Quint Cross-Appeal (No. 98-1342)
1. The Back-Pay Award
a) The Failure to Mitigate Damages
Quint contends that the district court erred in reducing
her back-pay claim from $125,580 to $45,917, representing 18
months' lost wages. The court reasoned that Quint had not
attempted to mitigate damages by seeking suitable alternative
employment following her discharge. Quint responds that Staley
failed to prove, inter alia, that there were substantially
equivalent jobs available in the relevant geographic area. We
review the back-pay award for abuse of discretion. See Carey v.
Mount Desert Island Hosp., 156 F.3d 31, 40 (1st Cir. 1998).
A prevailing ADA claimant is presumptively entitled to
all back pay which would have accrued from the termination date to
the entry of judgment, see Albemarle Paper Co. v. Halifax Local No.
425, United Papermakers and Paperworkers, AFL-CIO, 422 U.S. 405,
421-22 (1975); Lussier v. Runyon, 50 F.3d 1103, 1109 n.7 (1st Cir.
1995), provided it is made to appear that "reasonable diligence
[was exercised in the effort to secure] other suitable employment,"
Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982). As long as
the claimant has made some effort to secure other employment, the
burden to prove failure to mitigate normally resides with the
defendant-employer, see Carey, 156 F.3d at 41; Odima v. Westin
Tucson Hotel, 53 F.3d 1484, 1497 (9th Cir. 1995), which then must
show that (i) though substantially equivalent jobs were available
in the relevant geographic area, (ii) the claimant failed to use
reasonable diligence to secure suitable employment. See id.
Staley did not attempt to prove that substantially
equivalent jobs existed during the relevant time period, nor did
Quint attempt to obtain a job during the forty-plus months
following her discharge. In the relatively rare case where an
employee has remained completely idle following her discharge, some
courts of appeals have required that the defendant-employer
nonetheless demonstrate the same two elements: (1) the availability
of substantially equivalent jobs and (2) the absence of reasonable
diligence by the former employee. See, e.g., Booker v. Taylor Milk
Co., 64 F.3d 860, 866 (3d Cir. 1995); Odima, 53 F.3d at 1497;
Hutchison v. Amateur Elec. Supply, Inc., 42 F.3d 1037, 1044 (7th
Cir. 1994); accord Rasimas v. Michigan Dep't of Mental Health, 714
F.2d 614, 624 (6th Cir. 1983). Yet, in none of these cases did the
employer squarely urge the court to adopt the exception advocated
by Staley; namely, that once an employer has shown that the
claimant sought no jobs, it should be relieved of any burden to
prove the existence of substantially equivalent positions.
Other courts of appeals, squarely confronted with the
present contention, uniformly have relieved the defendant-employer
of the burden to prove the availability of substantially equivalent
jobs in the relevant geographic area once it has been shown that
the former employee made no effort to secure suitable employment. 
See, e.g., Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d
Cir. 1998); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527
(11th Cir. 1991); Sellers v. Delgado College, 902 F.2d 1189, 1193
(5th Cir. 1990). We likewise opt for the mitigation-defense
exception adopted in these cases.
Where an ADA claimant refrains from pursuing alternative
employment, we consider it reasonable to presume at the outset that
she did so for an articulable reason, perhaps because she possessed
information which suggested that a job search would have been
futile. Since it is the claimant who would possess any such
information, however, she is likely to be in the better position to
explain her preemptive decision to take no action to obtain
employment. We believe it will be the extraordinary case in which
an ADA claimant's decision to withdraw from the job market can be
found to have been justifiable, given that virtually all
reemployment prospects are plainly precluded absent some effort to
reenter the job market. Thus, we believe the mitigation policy
fostered by the ADA will be better served by the approach we adopt
today, since it affords reasonable inducements for ADA claimants to
attempt to secure alternative employment. Accordingly, the
district court correctly ruled that Quint's utter failure to
mitigate warranted the $79,663 reduction in the back-pay award.
b) Collateral-Source Benefits
Quint next contends that the district court abused its
discretion in reducing her back-pay award by the aggregate amount
of the disability insurance proceeds and the AFDC and food-stamp
benefits received following her termination. We agree.
Under the Maine Human Rights Act the court would lack
discretion to deduct from a back-pay award any post-termination
collateral-source payments received by the discharged employee. 
See Maine Human Rights Comm'n v. Department of Corrections, 474
A.2d 860, 869-70 (Me. 1984) ("MHRC"). Consequently, even if the
district court could reduce the ADA back-pay award by the amount of
the collateral benefits Quint received, it could not reduce the
MHRA back-pay award to which the jury verdict simultaneously
entitled her.
Staley argues that MHRC is inapposite, for two reasons. 
First, it notes that MHRC is predicated on equitable principles and
that the plaintiff in MHRC "rightfully" received unemployment
benefits whereas Quint "manipulated" the welfare system. Even
assuming these characterizations of the respective claimant's
conduct were meritorious, however, MHRC makes very clear that the
collateral-source rule permits no judicial discretion. See MHRC,
474 A.2d at 870 ("'[A] consistent approach to this legal question
seems preferable to a virtually unreviewable discretion which may
produce arbitrary and inconsistent results.'") (citation omitted).
Second, Staley argues that incorporation of the
collateral-source rule into the MHRA discrimination case law by the
Maine Supreme Judicial Court ("SJC") in MHRC is called into question
by Winston v. Maine Technical College Sys., 631 A.2d 70, 74 (Me.
1993), where the SJC noted that the MHRA "generally tracks federal
anti-discrimination statutes, [so] it is appropriate to look to
federal precedent for guidance in interpreting the MHRA." Once
again, however, assuming the quoted statement is correct as a
general principle, it avails Staley nothing.
The generalization to which Staley alludes in Winstondoes not permit a federal court to presume that all prior SJC
decisions which announced MHRA standards in conflict with emerging
federal standards were thereby overruled. Absent conspicuous
evidence that a state's highest court has abandoned a previously-
announced rule, it is not for the federal courts to presume as
much. See Carlton v. Worcester Ins. Co., 923 F.2d 1, 3 n.5 (1st
Cir. 1991) ("While it is not necessary that a state case be
explicitly overruled by the state court in order to lose its
persuasive force, there must at least be footprints pointing
conspicuously in that direction.") (citation omitted); Caraccioliv. KFC Mfg. Corp., 761 F. Supp. 119, 120 (M.D. Fla. 1991) ("Unlike
a state court, the federal courts, in diversity cases, 'are not free
to overrule existing state precedent or chart the future course of
state law in such manner as we may see fit.'") (citation omitted). 
Moreover, MHRC could not have been more emphatic. After
surveying the divergent collateral-source rules in other
jurisdictions, and addressing the difficult policy choices
presented, the SJC definitively and categorically opted for a clear
rule excluding collateral-source payments from the back-pay
equation. MHRC, 474 A.2d at 870 ("If either the victim of the
discrimination or the discriminating employer is going to receive
a windfall because part of the victim's loss has been paid for by
a third party, it is more just that the windfall should inure to
the injured party than to the wrongdoer."); see Pine v. Cole's
Express, Inc., 523 A.2d 1001, 1002 (Me. 1987) (expressly refusing
to reexamine MHRC collateral-source rule).
Moreover, even if Winston were deemed adequate license
for us to forecast what the SJC might do upon revisiting MHRC, the
principle enunciated in Winston would provide useful guidance only
if a consensus existed on the collateral-source issue among the
federal courts. Yet the courts of appeals are in disagreement
regarding the collateral-source issue as it relates to
discrimination claims under federal law, and the United States
Supreme Court has yet to address the issue. Thus, there is no
"federal precedent" consensus upon which the SJC might "piggy-back"
its state rule.
Accordingly, Quint is entitled to an MHRA back-pay award
free of reductions attributable to collateral-source payments. 
Thus, the final back-pay award must be increased from $8,019 to
$45,917.
2. Reinstatement
The district court ruled that reinstatement would be
impracticable because there were no available "light-duty" jobs
Quint could perform, and the "tensions" between Quint and her former
coworkers would create an intolerable work environment. We review
its decision only for abuse of discretion, Kelley v. Airborne
Freight Corp., 140 F.3d 335, 353 (1st Cir.), cert. denied, 119 S.
Ct. 341 (1998), and will reverse only for "'a meaningful error in
judgment,'" Lussier, 50 F.3d at 1111 & n.9 (citation omitted). 
Although the district court has considerable equitable discretion
to deny reinstatement, the two grounds it ultimately relied upon
afford an insufficient basis for affirming its ruling. 
Accordingly, we must remand for further proceedings. See, e.g.,
id. at 1115.
Staley points to evidence that no "light-duty" jobs are
currently available, and argues that the ADA does not require that
a "new" job be created for Quint. See Shea v. Tisch, 870 F.2d 786,
788-90 (1st Cir. 1989). Be that as it may, Staley has yet to
confront the appropriate inquiry: whether it can and should
reinstate Quint to her former position as a press operator. 
Although the district court possesses the requisite
discretion to refuse reinstatement if an ADA claimant's former
position no longer exists, see, e.g., Ray v. Iuka Special Mun.
Separate Sch. Dist., 51 F.3d 1246, 1254 (5th Cir. 1995); Cassino v.
Reichhold Chems., Inc., 817 F.2d 1338, 1346 (9th Cir. 1987); Eldredv. Consolidated Freightways Corp. of Del., 907 F. Supp. 26, 28 (D.
Mass. 1995), we can discern no record evidence that there are no
press-operator positions for which Quint could qualify. Staley
offered Operations Manager Saunders as its sole witness at the
equitable-remedy hearing. Saunders testified that no "light-duty"
positions currently existed at Staley. According to Saunders, a
"light-duty" position meant one which was "not makeshift" and which
the employee could "do within [her] physical restrictions." Asked
to define what physical restrictions were accommodated within the
term "light-duty," Saunders testified: "I'm saying just about it
would depend on the restrictions the individual has." Although he
stated that he did not know Quint's current restrictions, he
testified that no available jobs could accommodate a ten-pound
weightlifting restriction.
Moreover, according to Saunders a post-March 1994
reduction-in-force further frustrated any such accommodation
because employees thereafter "worked harder and did more work." 
Furthermore, two or three people had left the process department in
the past year, either on disability or retirement, and Staley had
hired two temporary part-time replacements. Saunders declined to
classify the lighter-duty position Quint held prior to her 1994
discharge as a "light-duty" position, because Staley had intended
those accommodations to be temporary only, not permanent. Thus, he
said, a permanent accommodation for Quint's disability was simply
"impossible." The conclusory and unelaborated testimony by Saunders
provided inadequate support for denying reinstatement.
In the first place, reinstatement is the "overarching
preference" among all equitable remedies under the ADA, as it most
efficiently furthers "the dual goals of providing full coverage for
the plaintiff and of deterring such conduct by employers in the
future." Kerr-Selgas v. American Airlines, Inc., 104 F.3d 9, 12
(1st Cir. 1997). Secondly, the unmistakable import of the Saunders
testimony is that Staley did have currently available press-
operator positions, but that it chose not to reinstate even the
reasonable accommodations afforded Quint in 1993-94.
Thus, Quint testified: "If they would let [her] do the
lighter-duty position . . . [she held previously]," she would have
been "physically . . . able to work at Staley." Moreover, Saunders
agreed that Staley "believed [Quint] could do the job" at the time
she was fired, and that "the company thought that her inability to
lift was something you could work around with respect to that
particular job." Based on this evidence, the jury reasonably found
that Quint was "qualified"; that is, capable of performing the
"essential functions" of the press-operator position with or without
reasonable accommodation. See supra note 3.
In determining appropriate equitable relief, the district
court was strictly constrained by these jury findings. See, e.g.,
United States EEOC v. Century Broad. Corp., 957 F.2d 1446, 1463
(7th Cir. 1992); Song v. Ives Lab., Inc., 957 F.2d 1041, 1048 (2d
Cir. 1992); Harvis v. Roadway Express, Inc., 923 F.2d 59, 61 (6th
Cir. 1991). Thus, were it to appear that a press-operator position
is available at Staley, the district court would be required to
assume that Quint could perform it, with reasonable accommodation.
Saunders suggested that Quint would not be returned to
the "same" press-operator position because an alleged post-March
1994 "reduction in force" had required employees to "work[] harder." 
Absent some further evidentiary development, however, there is no
reliable way to determine the degree, if any, to which the alleged
reduction-in-force may have altered press-operator responsibilities
so as to aggravate Quint's CTS. Furthermore, even if it were to be
assumed that the alleged reduction-in-force resulted in increased
press-operator duties, the question would remain whether Staley
reasonably could have accommodated Quint's disability within the
modified press-operator position. After all, the jury found
nothing more than that, as of the date Quint was discharged, Staley
had not failed to make reasonable accommodations for her
disability. Because the jury was never instructed that Staley
could meet its ADA obligation merely by making a temporaryaccommodation, this finding may simply reflect the jury's
recognition that the parties were engaged in ongoing negotiation
and consultation over what measures would achieve an appropriate
accommodation.
Moreover, since Staley illegally discharged Quint in
March 1994 it was not necessary for the jury to determine what
further accommodations Staley would have been obligated to make as
future conditions might warrant. For example, Saunders conceded
that "several employees at Staley other than [plaintiff] have been
given permanent light-duty jobs," some when they "got hurt." At
trial, Baker acknowledged that the quest for reasonable
accommodation was an ongoing, wait-and-see process. See Criado, 145
F.3d at 445 ("The duty to provide reasonable accommodation is a
continuing one, however, and not exhausted by one effort.")
(quoting Ralph v. Lucent Techs., Inc., 135 F.3d 166, 172 (1st Cir.
1998)); 29 C.F.R. 1630.2(o)(3) ("[I]t may be necessary for the
covered entity to initiate an informal, interactive process" with
the disabled employee.). 
Significantly, Saunders acknowledged that Staley nevercontended that its accommodation of Quint's disability would cause
it "undue [financial] hardship." See 42 U.S.C. 12112(b)(5)(A)
(employer must make reasonable accommodation "unless [it] can
demonstrate that the accommodation would impose an undue hardship
on the operation of the business of such covered entity"). 
Moreover, the trial record amply documented other possible
accommodations as well.
The ergonomist hired by Staley's insurer made several
recommendations which Staley elected not to adopt, including one
which would have excused Quint from overtime work. See id. 
12111(9)(B) (reasonable accommodation may include "modified work
schedules"). In addition, Staley could have elected to heat the
warehouse and/or the processing areas and to repair the air system
which powered the automatic manipulators' suction devices. The
latter accommodation would have relieved press operators from
lifting heavy bags by hand. Finally, since process operators work
in teams, with each person performing discrete assembly-line
functions, Staley might have assigned Quint permanently to a team
position which minimized stress on her wrists, arms and shoulders. 
Thus, to deny reinstatement on the present record would reward
Staley for terminating prematurely the required effort to reach a
reasonable accommodation.
Were it made to appear on remand that a press-operator
position is available, Quint presumably would be entitled to
reinstatement by virtue of the jury verdict in this case, at leaston the same terms allowed by Staley prior to March 1994. Should
additional accommodations be required, Staley would need to
determine in the first instance whether any such accommodations are
"reasonable" under the ADA. Of course, should it refuse further
reasonable accommodation as appropriate, it would expose itself
once again to ADA liability.
The district court finding that "tensions" continued
between Quint and her former coworkers presents a different
problem. Although Staley's brief below represented that coworker
tensions existed, statements by counsel are not competent evidence. 
See Fernandez v. Chardon, 681 F.2d 42, 56 n.10 (1st Cir. 1982)
(statements by counsel are no substitute for admissible evidence),
aff'd, 462 U.S. 650 (1983). The record on appeal is devoid of any
testimony or other evidence from any current Staley employee that
working with Quint would be intolerable. See Lussier, 50 F.3d at
1113 (vacating front-pay award and noting that "[i]t is a
fundamental principle of our jurisprudence that a factfinder may
not consider extra-record evidence concerning disputed adjudicative
facts"). Thus, the only suggestion of coworker tensions in the
appellate record consists of conclusory assertions by Staley's
counsel.
These assertions are infirm for other reasons as well. 
First, the only clear-cut evidence at trial showed no antagonism
among Quint's coworkers in 1993-94. When asked: "Do you remember
that a lot of coworkers complained about the accommodations being
made for Jackie Quint?," coworker Arnold Gonya answered: "No, I
don't." On the other hand, Baker testified in vague and tentative
terms: "I believe there had been some friction with some of the
workers around how much [Quint] was doing . . . some feelings of
inequities perhaps by her coworkers." (Emphasis added.) Baker
neither related any specific coworker complaint nor identified a
particular complainant. Saunders testified to having heard ofcomplaints, but when asked to confirm complaints by any particular
employee, stated: "I can't remember for sure."
Moreover, given the four-year lifespan of the present
litigation, it is not even clear that any former coworker is still
employed at Staley. Nor can we presume, as Staley does without a
shred of evidence, that Quint's forty or more coworkers must be
intolerably envious because she won $300,000 in damages, while they
are considerably less well off. The factual assumptions underlying
this presumption (e.g., coworkers' empathy for management rather
than their coworker) amount to little more than rank speculation.
Finally, we state the obvious. While it may be that
Staley's unsubstantiated reference to "coworker tensions" cloaks
Staley management's antagonism toward Quint, rarely could an ADA
claimant be reinstated were any such employer antagonism considered
an adequate ground for denying reinstatement, see Century Broad.,
957 F.2d at 1462, and the legislative aims of the ADA surely would
be ill served.
We do not state that coworker hostility, adequately
proven real and intolerable, may not provide an appropriate ground
for refusing reinstatement. See, e.g., Deloach v. Delchamps, Inc.,
897 F.2d 815, 822 (5th Cir. 1990) (determining reinstatement
impracticable where it would cause morale problems and disrupt
other individuals' employment). Given the current record and the
prominence of the reinstatement remedy under the ADA scheme,
however, adequate review of the district court's denial of
reinstatement is impracticable.
III
CONCLUSION
Accordingly, we remand to the district court for such
further proceedings as it deems necessary and appropriate to inform
the further exercise of its discretion relating to reinstatement. 
See Lussier, 50 F.3d at 1115 (vacating front-pay award due to
court's reliance on extra-record evidence, and noting that court on
remand may opt between another evidentiary hearing or "hold[ing]
the parties to their proof at trial [and] . . . the existing
record"); see also Kerr-Selgas, 104 F.3d at 15 (vacating
reinstatement ruling on same grounds). Should a further
evidentiary hearing appear appropriate, the parties should adduce
specific evidence relating to the availability of current press-
operator positions at Staley, and any current coworker hostility
toward Quint which might make reinstatement impracticable.
For the foregoing reasons, the $300,000 damages award is
affirmed; the back-pay award is increased from $8,019 to $45,917;
the district court ruling denying reinstatement is vacated and the
case is remanded for further proceedings consistent herewith. 
Costs to appellant.
SO ORDERED.