Leonard LACY, Petitioner, Appellant,

v.

Joseph GARDINO, Superintendent, Northeastern Correctional Center—Concord, Respondent, Appellee.

No. 85–1678.

United States Court of Appeals, First Circuit.

Argued Feb. 3, 1986.

Decided May 27, 1986.

Benjamin Hiller with whom Goldstein, Pressman, Hiller & Kruskal, Cambridge, Mass., was on brief, for petitioner, appellant.

Frances L. Robinson, Asst. Atty. Gen., Criminal Bureau, with whom Francis X. Bellotti, Atty. Gen., and Barbara A.H. Smith, Asst. Atty. Gen., Chief, Crim. Appellate Div., Boston, Mass., were on brief, for respondent, appellee.

Before BOWNES and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.

BOWNES, Circuit Judge.

Leonard Lacy, who was convicted of first degree murder in Massachusetts, appeals a denial by the district court of his petition for habeas corpus. Lacy alleges that his sixth amendment rights to cross-examination, confrontation, and counsel, as well as his right to an unbiased jury, were violated because, during deliberations, one of the jurors peeled tape off two exhibits which had masked facts about Lacy's prior prison commitments.

In a previous habeas petition arising out of this same conviction, Lacy had made a claim that his fourteenth amendment right to due process had been violated by the unmasking. In reviewing that petition, the district court, *sua sponte*, directed the parties to also brief the sixth amendment implications of the juror's action. The district court then found that while Lacy's sixth amendment right to confrontation had been violated, the error was harmless. *Lacy v. Gabriel*, 567 F.Supp. 467 (D.Mass.1983). Upon review, we determined that the sixth amendment issue had not been exhausted in the Massachusetts courts and that the district court should not have decided it. *Lacy v. Gabriel*, 732 F.2d 7 (1st Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 195, 83 L.Ed.2d 128 (1985) (*Lacy I*). We then

went on to hold that the juror's action did not produce "a species of unfairness which implicates due process" and affirmed the district court's denial of the petition so far as it related to the fourteenth amendment due process claim.

Lacy then returned to the state superior court and requested that the judge who had reviewed this the first time either state that the sixth amendment issues had already been considered or grant a new trial based upon these claims. The superior court judge issued an order which Lacy took to mean that the sixth amendment issues had already been considered and he then returned to the district court. The district court did not read the superior court order as extending the previous hearing to the sixth amendment issues and directed Lacy back to the state appellate court. Lacy then sought leave from a single justice of the Supreme Judicial Court to appeal the superior court order. This was denied leaving Lacy with no further recourse in state court. *See Leaster v. Commonwealth*, 385 Mass. 547, 432 N.E.2d 708 (1982). Lacy then returned to the district court and filed a new petition for habeas corpus. This petition was denied by the district court on the basis of the memorandum which accompanied the district court's previous consideration of Lacy's habeas petition, 567 F.Supp. 467, as supplemented by a memorandum dictated by the judge in open court. Lacy appeals this denial.

FACTUAL BACKGROUND

Several years after Lacy's conviction for first degree murder, William Wolbach, one of the twelve jurors who sat on the Lacy trial, revealed that he had peeled tape off two exhibits, 4 and 20, portions of which had been masked by the court to prevent information about Lacy's criminal record from reaching the jury. After learning of Wolbach's action, Lacy filed a motion in state court for a new trial. This motion was heard by Superior Court Justice Pierce, who was not the original trial judge. At the hearing, Wolbach was questioned by counsel for Lacy, counsel for the

* Of the District of Rhode Island, sitting by designation.

Commonwealth, and the court itself. As a result of the hearing and an evaluation of the evidence that came before the jury through Wolbach's unmasking of the exhibits, Justice Pierce ruled that this information was merely cumulative of other information about Lacy's criminal past which was properly before the jury and denied Lacy's motion for a new trial.

Justice Pierce's finding that the evidence revealed by the unmasking of exhibits 4 and 20 was merely cumulative was based on the information disclosed in exhibit 19, which was a jail identification card bearing a photo of Lacy. The card had been introduced by the defense to show that Lacy did not resemble the description of a witness at the time of the murder. On this card was a notation which read "No. of Former Commitments 5." Lacy did not request to have this notation masked and the exhibit went to the jury with this information fully visible. Exhibit 4 was a front and side mug shot of Lacy introduced by the Commonwealth, with the I.D. number and the words "Police Department, Boston, Mass." masked by tape. Exhibit 20, which was introduced by the Commonwealth to rebut exhibit 19, was a Suffolk County jail card containing a picture of Lacy around the time of the crime. At the request of the defense, the court masked notations on this card which said "Bail $25,000," "Walpole, yes," "Norfolk, yes," "Brighton District Court," and "No. of Former Commitments 3-4." Justice Pierce concluded that the additional information provided to the jury by the unmasking of exhibits 4 and 20 was merely cummulative of the information available through exhibit 19.

Justice Pierce also found that at the time Wolbach removed the tape from the exhibits the vote stood at 11–1 for Lacy's conviction and that Wolbach was the sole holdout juror. He further found that Wolbach had discussed the unsanitized exhibits with the other jurors and subsequently changed his vote to "guilty." In addition to these findings, the transcript of the hearing provides some additional facts about the effect of the unsanitized exhibits upon juror Wolbach. These, however, were not referred to by Justice Pierce in his denial of Lacy's motion for a new trial or his later order indicating that Wolbach's conduct vis-a-vis the sixth amendment was "harmless beyond a reasonable doubt." In response to a question by Justice Pierce, Wolbach indicated that what he learned by unsanitizing the exhibits "had a significant amount to do with" changing his vote. Wolbach also volunteered that at the time he unsanitized the exhibits,

> "I was trying to develop—to get somebody else to be on my side.... I felt pretty desperate, and I was trying to get—if I could get one person, I felt that I could maybe hold off, but I couldn't get anybody else. There had been other people, and they fell by the wayside."

The effect of the unsanitized evidence upon the other jurors, according to Wolbach, was simply to strengthen their belief that Lacy was guilty: "And after that, after I had shown them, they turned around and said, 'Well, that's all the more evidence for—you know, all the more reason for getting him off the streets.'" (Wolbach's testimony.) Wolbach testified that after a while "I just gave—I did just give up."

## SIXTH AMENDMENT VIOLATION

In its memorandum denying Lacy's first petition for habeas corpus, the district court held that Wolbach's conduct amounted to a violation of Lacy's sixth amendment right to confront evidence against him. This holding was not disturbed by the supplemental memorandum accompanying the denial of Lacy's second habeas corpus petition. The State argues that Wolbach's conduct does not amount to a violation of Lacy's sixth amendment right of confrontation because the information revealed through the unmasking was substantially similar to information already before the jury unrelated to Wolbach's unmasking. During the trial, the jury had heard testimony from a police officer, which was then stricken from the record, concerning Lacy's involvement in other criminal activity. The trial judge instructed the jury as to the proper consideration to be given to Lacy's

prior bad acts. The jury had before it during deliberations even without any unmasking: exhibit 4, a photograph in standard front and profile "mug-shot" form, although with the Boston Police and I.D. number masked; exhibit 19, upon which were exposed the words, "No. of Former Commitments 5"; and exhibit 20, upon which were exposed the words "Suffolk County Jail," "WARRANT," and "Offense Att. Larceny." The State argues that because the information before the jury, which Lacy had every opportunity to confront, was similar to the masked information, the unmasking of exhibits 4 and 20 by Wolbach should be viewed as simple misconduct by jurors in discussing materials ordered by the court to be disregarded, which is not considered a sixth amendment violation.

In *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the Supreme Court stated: "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472–73, 85 S.Ct. at 549–50. *See also Parker v. Gladden,* 385 U.S. 363, 364–65, 87 S.Ct. 468, 470–71, 17 L.Ed.2d 420 (1966). Jury exposure to facts not admitted during trial violates the sixth amendment right to trial by jury by permitting evidence to reach the jury which has not been subjected to confrontation or cross-examination and to which counsel has not had the opportunity to object or request a curative instruction. *Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir.1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981); *United States v. Howard,* 506 F.2d 865, 866 (5th Cir.1975). That counsel had an opportunity to confront or object to similar facts does not change the fact that specific information was disclosed to the jury in violation of defendant's sixth amendment rights of confrontation and cross-examination. Accordingly, we find that the effect of Wolbach's conduct created an error of constitutional proportions.

The presence of a constitutional error, however, does not automatically lead to reversal. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22. Lacy claims that the constitutional right violated by this error is "so basic to a fair trial that [its] infraction can never be treated as harmless error." *Id.* at 23. The Supreme Court has recently said that the right to be represented by counsel, "as with most constitutional rights, [is] subject to harmless-error analysis ... unless the deprivation, by its very nature, cannot be harmless." *Rushen v. Spain,* 464 U.S. 114, 118 n. 2, 104 S.Ct. 453, 455 n. 2, 78 L.Ed.2d 267 (1983). The Court offered as an example of a violation which could never be harmless the complete deprivation of counsel condemned in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). We do not consider that the deprivation of counsel and the right to confront and cross-examine here reaches the level of *Gideon.* The *Chapman* harmless-error analysis is appropriately applied to this case.

In *Chapman,* the Supreme Court held that an error will be considered harmless only if "the beneficiary of ... [the] constitutional error ... [can] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24. Our only difficulty in applying this test lies in determining what factors should be considered in deciding if the error "contributed to the verdict." The district court weighed the evidence properly before the jury along with Wolbach's testimony that even before the unmasking, as the only holdout juror, he was resigned to eventually voting for con-

viction. Based on this evaluation, the court determined that the jury would have convicted Lacy anyway. It is Lacy's contention that the district court did not approach the question of "harm" properly. Lacy argues that because inquiry by the court into the deliberation process is forbidden, the court improperly took into account Wolbach's testimony that the vote stood at 11–1 for conviction prior to the unmasking.

## MENTAL PROCESS TESTIMONY

A brief review of the procedural history of this habeas corpus petition and Lacy's previous habeas corpus petition is necessary to understand this issue. Justice Pierce, in his memorandum following the evidentiary hearing, at which Wolbach testified, specifically pointed out that the vote of the jury prior to the unmasking was 11–1, with Wolbach holding out, and that after the unmasking Wolbach changed his vote to guilty. The United States District Court, in denying Wolbach's petition for habeas corpus, adopted Justice Pierce's findings of fact and stated:

> Nevertheless, we do have the objective evidence that eleven of the twelve jurors were convinced of defendant's guilt beyond a reasonable doubt before the extraneous information was revealed. This is, in our opinion, the strongest possible indication, apart from the independent evaluation of the evidence which the court has just undertaken, that the properly admitted evidence alone, beyond a reasonable doubt, would have convinced a reasonable juror of defendant's guilt.

Lacy then appealed to this court; one of the grounds of the appeal was the district court's use of Wolbach's testimony about the vote prior to the unmasking. Without addressing this issue, this court, in *Lacy I*, relied not only upon the 11–1 vote to support the state court's denial of a new trial, but also on Wolbach's testimony concerning his motive for the unmasking and the effect it had upon him. Lacy's petition for rehearing and suggestion for rehearing en banc was subsequently denied. Lacy then petitioned the United States Supreme Court for certiorari, raising the propriety of both the district court's and our use of testimony concerning juror mental processes. The Supreme Court denied certiorari. Lacy then returned to Justice Pierce in an attempt to exhaust the sixth amendment claim which we had refused to consider in *Lacy I*. Justice Pierce issued an order stating that the sixth amendment issues had been considered in the original order. A second habeas corpus petition was then filed in the district court on purely sixth amendment grounds. The petition was denied by the district court on the basis of its previous memorandum, which had considered the vote, with a supplemental order discussing our opinion in *Lacy I* and Wolbach's mental processes relative to the unmasking. This reliance on the vote and juror mental process is now one of the grounds for appeal of the denial of this second habeas corpus petition.

◼ In light of this procedural history, the State argues that our implicit rejection of Lacy's argument against the use of mental process evidence in *Lacy I*, followed by our denial for rehearing and the Supreme Court's denial of certiorari, is now the "law of the case" for purposes of this appeal. The law of the case doctrine makes binding upon a court a ruling made by a court at the same or higher level during prior stages of the same litigation, unless, of course, the ruling has been reversed in the interim. J. Moore, J. Lucas, T. Currier, 1B Moore's Federal Practice § 0.404[1] (1984). Thus, the State argues that our "ruling" allowing consideration of mental process evidence in *Lacy I*, not reversed in the interim, is now law of the case for *Lacy II*, presently before us.

◼ The State's "law of the case" argument rests upon the premise that the habeas petition in *Lacy I* and *Lacy II* are successive stages of the same litigation. It is by no means clear, however, that these two habeas petitions are part of the same case. If each habeas petition is a separate and distinct case, the appropriate doctrine of finality would be *stare decisis* and not law of the case. Although we have grave doubts about the propriety of our consider-

ation of mental process evidence in *Lacy I*,[1] application of the doctrine of *stare decisis* would require that *Lacy I* be followed. Uniformity of decisions within a multi-panel circuit can only be achieved by strict adherence to prior circuit precedent, with the error-correcting function reserved to the court sitting en banc. 1B Moore's Federal Practice ¶ 0.402[1] at 19–20. Application of the doctrine of law of the case, however, might not lead to the same result. Where the obedience of a lower court of the decision of a superior court is not at issue, the law of the case prohibition against reconsideration of issues settled by the same court is less than absolute. *Id.*, ¶ 0.401 at 4. The prohibition is not so rigid nor the policy so strong that it mandates the perpetuation of clearly erroneous rulings. *Id.*, ¶ 0.401[1] at 124, ¶ 0.404[4.–61] at 147. *See also Doe v. Anrig*, 728 F.2d 30, 31 (1st Cir.1984), *aff'd*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Consequently, we might decide to repudiate our consideration of mental process evidence in

*Lacy I* were the two habeas petitions considered part of the same case. We need not decide, however, whether the two habeas petitions are the same or different cases requiring the application of either the law of the case doctrine or *stare decisis*. Even were we to find that the mental process evidence should not have been taken into consideration, the outcome of this appeal would be an affirmance of the denial of the writ by the district court. Our analysis follows.

Assuming that the district court's reliance upon the evidence of the tentative vote prior to the unmasking was in error, we would have to evaluate its significance in the district court's final determination that the exposure of the jury to the extra-record evidence was harmless error. In its original memorandum denying the writ, the district court indicated that the 11–1 vote prior to the unmasking provided "the strongest possible indication" that the properly admitted evidence alone would have produced a conviction. In its supple-

---

**1.** Were we to reconsider *Lacy I*, we would have to take into account the long-standing rule limiting the scope of a juror's testimony impeaching the verdict. A juror "may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his [or her] mind." *Clyde Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892).

> Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard.

*Id.* at 148–49, 13 S.Ct. at 52–53 (quoting *Perry v. Bailey*, 12 Kans. 539, 545). *See also Rushen v. Spain*, 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 457 n. 5, 78 L.Ed.2d 267 (1983) ("a juror generally cannot testify about the mental process by which the verdict was arrived"); *Government of*

*Virgin Islands v. Gereau*, 523 F.2d 140, 149 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) (no evidence permitted from juror as to mental process of juror or jury or method by which the verdict is reached). This policy of limiting juror impeachment has also been incorporated into Federal Rule of Evidence 606. It would appear that Wolbach's status as a holdout juror prior to the unmasking, his reason for unmasking the exhibits, the preliminary vote of the other eleven jurors prior to the unmasking and the effect of the unmasking on Wolbach and the other jurors all concern the mental processes of the jury and the impact of the extra-record evidence upon these mental processes. The Advisory Committee Notes to F.R.E. 606(b) indicate that the limitation on testimony extends to "each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process." The limitations of Rule 606(b) would be fully applicable to the present proceeding even though the evidence in question was developed during a state court evidentiary hearing. *Smith v. Brewer*, 444 F.Supp. 482, 489 (S.D.Iowa), *aff'd*, 577 F.2d 466 (8th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978). In any event, Rule 606(b) is essentially a codification of preexisting common law. *United States v. Eagle*, 539 F.2d 1166, 1170 (8th Cir.1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977).

mental memorandum denying Lacy's second habeas petition, however, the district court indicated that it relied only partially upon the 11–1 vote in making the harmless error determination. The other factor in its decision was the State court's evaluation of the extra-record evidence as merely cumulative and its own determination of the weight of the properly admitted evidence. We turn, therefore, to the harmless error question.

■ The question is whether the district court's determination that the jury's exposure to the extra-record evidence was harmless can stand without the evidence of the jury vote. We have previously held that in order to determine harmless error "a reviewing court must assess the record as a whole to determine the impact of the improper evidence upon the jury.... The prejudicial effect of the improper evidence must be weighed against the weight of the properly admitted evidence." *Morgan v. Hall,* 569 F.2d 1161, 1166 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978). As the district court recognized, state court findings of fact are presumptively correct in habeas review. 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Accordingly, the district court accepted as correct the state court findings concerning the fact of the unmasking and the information thereby revealed. However, the district court found that the state court's conclusion that this information was merely "cumulative" went beyond a finding of "historical fact," *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983), and included the issue of the "harmlessness" of the error. The district court considered this to be a conclusion of law and entitled to no presumption of correctness. We agree that the state court's finding that the extra-record evidence was "cumulative" was not a matter of fact entitled to a presumption of correctness. A critical element in the analysis of possible harm is a determination of the prejudicial nature of the extra-record evidence. A finding that the evidence was merely cumulative is a conclu-

sion that it was not prejudicial or, in other words, that it was harmless. This was properly a matter for the district court to determine *de novo.*

In its initial memorandum, accompanying the denial of the first petition, the district court based its finding of harmlessness on two factors: a review of the evidence revealed "copious evidence of Lacy's guilt" and the 11–1 vote showed that this evidence had pretty well convinced the jury. Putting aside the information on the vote would leave the district court's determination of harmlessness resting solely upon the "copious evidence of Lacy's guilt." After setting aside the state court's finding that the extra-record evidence was cumulative, the district court did not itself consider the possible prejudicial effect of the extra-record evidence, but merely evaluated the strength of the State's case. Because the critical question is whether the error had an "impact" upon the jury, its probable effect upon the jury must be considered. While the strength of the State's case must be taken into account, the presence of highly prejudicial extra-record evidence can cast doubt even upon a verdict strongly supported by the evidence. Thus, for example, in *Gibson v. Clanon,* 633 F.2d 851, the court found that despite the strength of the State's case against the defendants, the prejudicial nature of the evidence obtained was such that it could not conclude beyond a reasonable doubt that it had not had an effect upon the verdict. Here, the district court should have evaluated the extra-record evidence in its initial memorandum.

■ In the supplemental memorandum accompanying the denial of the second habeas petition, however, the district court did place some weight upon the "cumulative" nature of the evidence in reaffirming its original determination of "harmlessness." Although not making its own evaluation, the district court noted that this court, in *Lacy I,* had indicated that it found the State court's finding that the extra-record evidence was cumulative to be well

supported. This is, in our opinion, sufficient to correct any error in analysis made in the district court's initial memorandum, even though our conclusion in *Lacy I* was based, in part, upon the information about the jury mental processes and, in part, upon our own evaluation of the extra-record facts compared to the facts already before the jury. We find that even without taking into account the juror testimony, our comparison of the record and the extra-record evidence alone provides ample support for concluding that the extra-record evidence was cumulative. The district court's determination that the unmasking was harmless error was correct. We, therefore, affirm the district court's denial of the petition for habeas corpus.

*Affirmed.*