USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

Nos. 97-1604
 97-1617

 UNITED STATES,

 Appellee,

 v.

 JULIO C. SANTANA,

 Defendant, Appellant.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 Bownes, Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 

 Robert A. Costantino for appellant.
 Heidi E. Brieger, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for appellee.

April 21, 1999

 
 LIPEZ, Circuit Judge. Julio C. Santana appeals his
convictions for conspiracy to possess cocaine base with intent to
distribute in violation of 21 U.S.C. 846 and for possession of
cocaine base with intent to distribute in violation of 21 U.S.C.
 841. On appeal Santana challenges, inter alia, the court's
decision to accede to the jury's request after the close of
evidence and during its deliberations to return to the courtroom
and observe Santana's ears, which had been covered by headphones
used for Spanish translation throughout the course of the trial,
and the sufficiency of the evidence. Although we find that there
was sufficient evidence to convict Santana, we conclude that the
court committed reversible error by allowing the jury to observe
Santana's ears during its deliberations, and hence to consider
extrinsic information not properly admitted during the trial. 
Accordingly, we vacate the judgment.
 I.
 We recite the facts in the light most favorable to the
verdict, consistent with support in the record. See United Statesv. Santiago, 83 F.3d 20, 22 (1st Cir. 1996). In 1994 the United
States Drug Enforcement Administration ("DEA"), working in
conjunction with the Worcester Police Department ("WPD"), began a
year-long investigation of cocaine, crack, and heroin trafficking
in Worcester, Massachusetts. The government was assisted in its
investigation by Dien Van Huynh ("Huynh"), a confidential informant
who agreed to engage in controlled purchases of drugs from
suspected drug dealers. During the course of the investigations
and prosecutions, the DEA paid Huynh a salary and reimbursed his
expenses.
 On November 8, 1994, DEA agents outfitted Huynh with a
hidden monitoring device and gave him $2,000 to purchase two ounces
of crack cocaine from a suspected drug dealer named Rudy Matos. As
surveillance agents watched from a nearby location, Huynh waited
for Matos at a local donut shop. Matos arrived in a blue Mazda,
spoke briefly with Huynh from his car, and drove away. Fifteen
minutes later Matos returned driving a black Mazda, spoke briefly
with Huynh, and drove away again. After another fifteen minutes
elapsed, Matos returned, this time driving a brown Datsun. Matos
and Huynh then left together in the Datsun and traveled to a
parking lot next to an apartment complex on Vernon Street in
Worcester. As they sat in the parking lot, Matos told Huynh that
his (Matos's) source for the crack cocaine drove a red Toyota 4-
Runner with tinted windows. 
 Shortly thereafter a red Toyota 4-Runner with tinted
windows registered to Julio Santana pulled into a parking lot next
to the apartment complex. Matos entered the passenger's side of
the 4-Runner, stayed for a moment, and then returned to the Datsun. 
Matos informed Huynh that the driver of the 4-Runner had only an
ounce and a half of crack cocaine instead of the two ounces that
Huynh had requested. Huynh agreed to purchase the smaller amount. 
Matos re-entered the 4-Runner, then exited and returned to the
Datsun with the drugs in his pocket. Matos and Huynh drove away in
the Datsun, followed by surveillance agents. 
 In an effort to identify the occupant of the 4-Runner,
Special Agent Brian Tomasetta had parked his surveillance vehicle
in a position that would permit observation of the 4-Runner's
driver "head-on" through the untinted front windshield as the
vehicle departed the area. Agent Tomasetta identified Santana at
trial as the person he had observed driving the 4-Runner, and
recalled that the vehicle's sole occupant was 
 a . . . male . . ., non-Caucasian, or
 nonwhite. He was in his late 20s to early
 30s. Very distinctive looking to me. By that
 I mean that he had close-cropped hair, very
 neat in appearance looking, possibly a
 mustache. And he had protruding ears or ears
 that stuck out. It was something that stuck
 out in my mind.
 
 About twenty minutes after Agent Tomasetta observed the
4-Runner's driver as the vehicle left the Vernon Street location,
he and WPD Sergeant Richard Burgos drove to J & M
Telecommunications, a business owned by Santana. The 4-Runner was
parked in front of the business, and a man was standing next to it. 
Agent Tomasetta remarked to Officer Burgos that this man was the
same person he had seen twenty minutes earlier driving the 4-Runner
away from the Vernon Street location. Officer Burgos, who knew
Santana from prior dealings, stated that the man was Santana. 
 Several months later, on February 23, 1995, government
agents executed a controlled purchase of heroin from Matos at his
home at 57 Outlook Drive in Worcester. Working undercover and
wearing a monitoring device, Agent Tomasetta purchased three ounces
of heroin from Matos, and at the same time placed an order for
crack cocaine to be delivered on short notice. A court-authorized
pen register indicated that minutes after Agent Tomasetta left 57
Outlook Drive, there was a call from that location to J & M
Telecommunications, Santana's business. Surveillance agents then
followed Matos to several locations, including J & M
Telecommunications, where they observed Matos meet Santana at the
door and enter the store with him. Approximately two hours later,
Matos met again with Agent Tomasetta at 57 Outlook Drive, where he
sold Tomasetta two ounces of crack cocaine. 
 Finally, on March 23, 1995, government agents planned
another controlled purchase of crack cocaine from Matos. Equipped
with a hidden transmitter and $3,000 in government funds, Huynh
once again met Matos near the Worcester donut shop. During this
meeting, Matos assured Huynh that the crack cocaine would be of
good quality because his supplier was the "same guy, red truck." 
This transaction was never completed because Matos demanded more
money than Huynh was authorized to pay. 
 In September 1995 a federal grand jury returned an
indictment charging Santana and Matos with conspiring to possess
cocaine base with intent to distribute, in violation of 21 U.S.C.
 846, and with possession of cocaine base with intent to
distribute, in violation of 21 U.S.C. 841. Matos pleaded guilty
and has not appealed his sentence. In the first prosecution
against Santana, the jury was unable to reach a verdict and the
case ended in a mistrial. At a second trial in April 1996, the
jury found him guilty on both counts. The district court sentenced
Santana to a 120 month term of incarceration followed by a 96 month
term of supervised release. This appeal followed.
 II.
 Santana challenges the sufficiency of the evidence
against him, arguing essentially that the government failed to
introduce any direct evidence that it was he who sold the crack
cocaine to Matos on either November 8, 1994, or on February 23,
1995. Although Santana moved unsuccessfully for a judgment of
acquittal at the close of the government's case, he did not renew
the motion after presenting evidence. See Fed. R. Crim. P. 29. 
Accordingly, our review is limited to the prevention of clear and
gross injustice. See United States v. Santiago, 83 F.3d 20, 23
(1st Cir. 1996); United States v. Taylor, 54 F.3d 967, 975 (1st
Cir. 1995); United States v. Clotida, 892 F.2d 1098, 1102-03 (1st
Cir. 1989). 
 In evaluating Santana's sufficiency challenge, we must
determine whether the evidence, taken in the light most favorable
to the government - a perspective that requires us to draw every
reasonable inference and to resolve credibility conflicts in a
manner consistent with the verdict would permit a rational trier
of fact to find each element of the crimes charged beyond a
reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319
(1979); Santiago, 83 F.3d at 23. The government can meet this
burden by either direct or circumstantial evidence, or by any
combination of the two. See Santiago, 83 F.3d at 23; United Statesv. Boylan, 898 F.2d 230, 243 (1st Cir. 1990); United States v.
Campa, 679 F.2d 1006, 1010 (1st Cir. 1982). Moreover, the
government need not disprove every hypothesis consistent with the
defendant's innocence; rather, it is enough that "a rational jury
could look objectively at the proof and supportably conclude beyond
a reasonable doubt that the defendant's guilt has been
established." United States v. Ingraham, 832 F.2d 229, 240 (1st
Cir. 1987); see United States v. Echeverri, 982 F.2d 675, 677 (1st
Cir. 1993).
 Although the government introduced no physical or
testimonial evidence establishing directly that it was Santana who
sold the crack cocaine to Matos, the government presented
sufficient evidence to support the convictions. Huynh's testimony
and a recorded conversation between Huynh and Matos established
that the crack cocaine supplier drove a red 4-Runner. There was
evidence that on November 8 a red 4-Runner registered to Santana
entered the Vernon Street parking lot, and that Matos purchased
crack cocaine from the vehicle's driver. Agent Tomasetta
identified the driver as Santana. This identification, although
vigorously challenged by the defense, directly tied Santana to the
drug transaction. The government also introduced evidence that on
February 23, after Agent Tomasetta placed an unexpected order for
crack cocaine with Matos, a call was placed from Matos's residence
to Santana's business; that Matos then went to Santana's business;
and that within about two hours after the order was placed Matos
sold Tomasetta the crack cocaine. In these circumstances, we
cannot conclude that the jury's verdict, on sufficiency of the
evidence grounds, represented a clear and manifest injustice.
 For the purpose of our sufficiency analysis, we of course
limit our review to evidence that was properly before the jury. 
Thus, our analysis does not take into consideration the appearance
of Santana's ears as corroborative of Agent Tomasetta's
identification, the issue to which we now turn. 
 III.
 Santana argues that the court committed reversible error
by acceding to the jury's request, after the close of evidence and
during its deliberations, to return to the courtroom and observe
Santana's ears, which had been covered during the trial by
headphones used for Spanish translation. We agree that the court
erred by allowing the jury to consider extrinsic information not
properly admitted during the trial, and that the error was not
harmless. 
 The Spanish-speaking Santana wore the headphones
throughout the trial, even during at least one period when he had
waived his right to have an interpreter present. Although Santana
pressed a "misidentification" theory (suggesting that it was
actually Matos's brother who had been behind the wheel of the 4-
Runner as it left the Vernon Street location on November 8), and
although Agent Tomasetta -- the only prosecution witness who had
observed the driver of the 4-Runner on November 8 -- cited the
driver's "protruding" ears as a distinguishing characteristic, the
prosecution did not ask Santana to remove his headphones at any
time during the trial, including during Tomasetta's in-court
identification of Santana. During its deliberations, the jury sent
this note to the judge: "May we see the defendant once without his
headphones on?" The judge granted the jury's request over the
defense's objection, reasoning:
 First of all, he had no right to have [the
 headphones] on this morning since you waived
 the right to an interpreter. That was just a
 disguising thing. More importantly, I was
 frankly surprised that throughout the course
 of the last trial that no one asked, neither
 the government nor the jury asked, for it
 because the whole issue here has been the
 ears. It's not testimony; it's just who he
 is. No one should be better off just because
 you speak Spanish, neither a better or worse
 position. Since [Santana's] ears were a
 prominent factor, I think in the interest of
 justice I will allow it.

The jury then entered the courtroom, observed Santana without his
headphones for about thirty seconds, and returned to their
deliberations. The judge noted for the record: "I didn't say
anything. Primarily it was because there was nothing to say and
also because the interpreter wasn't here. I minimized it." The
following day the jury returned guilty verdicts on both counts. 
 Our analysis of the judge's response to the jury's note
requires a proper characterization of the court's decision. Citing
United States v. Rivera-Santiago, 107 F.3d 960 (1st Cir. 1997),
United States v. Aubin, 961 F.2d 980, 983 (1st Cir. 1992), and
United States v. Hyson, 721 F.2d 856, 865 (1st Cir. 1983), the
government characterizes the court's decision as simply one that
"handled a jury question," reviewable for abuse of discretion. We
disagree. Rivera-Santiago, Aubin, and Hyson addressed the proper
standard of review to be applied to a court's handling of juror
requests to have previously admitted testimony re-read during
deliberations. Such decisions are reviewed under an abuse of
discretion standard. See Hyson, 721 F.2d at 865; see also United
States v. Gonzales, 121 F.3d 928, 944-45 (5th Cir. 1997) (applying
abuse of discretion standard to court's decision to allow jury to
inspect machinegun, where machinegun was properly admitted in
evidence during the trial); United States v. Rincon, 28 F.3d 921,
926 (9th Cir. 1994) (applying abuse of discretion standard to
court's decision to allow jurors to view defendant next to
surveillance photograph that was admitted during the trial). The
jury's request in the instant case, however, did not pertain to
evidence that was presented during the course of the trial. To
the contrary, Santana's ears had been hidden during the entire
trial by the court-authorized headphones, and the government did
not request at any time that he remove the headphones to allow the
jury to see his ears. The jury's request, therefore, related to
information extrinsic to the closed record. For this reason, we
find inapposite the authorities cited by the government in support
of an abuse-of-discretion standard. 
 Santana takes a different approach, characterizing the
court's decision to allow the jury to observe him without his
headphones after the close of all evidence as a "reopening" of the
case. A court's decision to reopen a case after the close of
evidence to permit the introduction of additional evidence is also
reviewable for abuse of discretion. See Lussier v. Ruynon, 50 F.3d
1103, 1113 (1st Cir. 1995); United States v. Blankenship, 775 F.2d
735, 740-41 (6th Cir. 1985); see also United States v. Pandozzi,
878 F.2d 1526, 1534 (1st Cir. 1989) (district court did not act
beyond its lawful powers by allowing prosecution to reopen its
case). This rule applies even when the district court reopens the
case on its own initiative, rather than on the motion of one of the
parties. See Lussier, 50 F.3d at 1113 (citing Calage v. University
of Tenn., 544 F.2d 297, 301-02 (6th Cir. 1976)); see also Maggardv. Wainwright, 432 F.2d 941, 942 (5th Cir. 1970). 
 In this instance, however, the court did not "reopen" the
case, as that term is commonly understood. Rather, the court
permitted the jury to consider information extrinsic to the closed
record without the formalities attendant to a reopening of the
case. The distinction between a "reopening" of a case and the
consideration of extrinsic evidence was at issue in Lussier v.Ruynon. In that case, the district court ordered the parties,
after they had rested, to submit factual information regarding the
plaintiff's disability retirement annuity that was germane to his
claim. See Lussier, 50 F.3d at 1106, 1113. The court characterized
its order as a "reopening" of the case. See id. at 1115 n.16. We
disagreed:
 
 [T]he district court despite what it said 
 did not reopen the record; instead, the court,
 over the plaintiff's objection, engaged in a
 unilateral pursuit of additional evidence
 without affording the parties the standard
 prophylaxis that generally obtains at trial.
 
 . . .

 Ours is a system that seeks the discovery of
 truth by means of a managed adversarial
 relationship between the parties. If we were
 to allow judges to bypass this system, even in
 the interest of furthering efficiency or
 promoting judicial economy, we would subvert
 this ultimate purpose. . . . [J]udges may not
 defenestrate established evidentiary
 processes, thereby rendering inoperative the
 standard mechanisms of proof and scrutiny, if
 the evidence in question is at all vulnerable
 to reasonable dispute.
 
Id. at 1113, 1114. Although Lussier was a civil case, we think its
basic reasoning applies with even greater force in the criminal
context. In this case, the court permitted the jury to file back
into the courtroom to observe Santana's ears without affording the
defendant any of the procedural protections of a criminal trial. 
There was no opportunity for further cross-examination of
prosecution witnesses or for the defense to introduce rebuttal
evidence; Santana's interpreter was not present; the parties were
not permitted to make additional arguments to the jury; and the
court itself acknowledged that it purposely "minimized" the
occasion. In these circumstances, the propriety of the court's
decision to allow the jury to consider extrinsic information is not
governed by the deferential abuse of discretion standard applied
when the court permits a case to be reopened after the close of
evidence. Rather, the decision was subject to de novo review and
it is error per se. 
 The court's approval of the jury's request to consider
information outside the record makes this case unusual. Most such
cases involve extrinsic information reaching jurors as a result of
inadvertence, see, e.g., United States v. Greene, 834 F.2d 86, 87-
89 (4th Cir. 1987), or juror misconduct, see, e.g., Lacy v.
Gardino, 791 F.2d 980, 982-83 (1st Cir. 1986). The origin of the
extrinsic information, however, does not alter our analysis. The
jury's exposure during its deliberations to extrinsic information,
whatever its source, is an error of constitutional proportions that
is grounds for setting aside the verdict, unless the exposure was
harmless. See United States v. Williams, 809 F.2d 75, 80-81 (1st
Cir. 1986); Lacy v. Gardino, 791 F.2d 980, 983 (1st Cir. 1986); seealso Eslaminia v. White, 136 F.3d 1234, 1237 (9th Cir. 1998);
United States v. Gonzales, 121 F.3d 928, 944-45 (5th Cir. 1997);
United States v. Barnes, 747 F.2d 246, 250-51 (4th Cir. 1984). 
Such exposure to extrinsic information deprives a criminal
defendant of the protections of the Sixth Amendment, including his
right of confrontation, of cross-examination, and of counsel. SeeLacy, 791 F.2d at 983 (citing Turner v. Louisiana, 379 U.S. 466,
472-73 (1965))(juror's peeling tape off exhibits and revealing
information about defendant's criminal record created an error of
constitutional proportions); Eslaminia, 136 F.3d at 1237 (jury's
exposure to tape recorded interview of defendant that was not
admitted in evidence deprived defendant of Sixth Amendment rights);
see also United States v. Hans, 738 F.2d 88, 93 (3d Cir. 1984). 
While we recognize the unusual nature of the jury's request, and
while we understand the able trial judge's frustration with
Santana's use of his headphones when they were not needed and the
government's failure to request that he display his ears to the
jury notwithstanding their obvious import to the case, the judge
should not have intervened by allowing the jury to observe
Santana's ears after the close of evidence and without the standard
safeguards of a criminal trial.
 The presence of constitutional error, however, does not
necessarily require reversal. See Lacy, 791 F.2d at 983; United
States v. Williams, 809 F.2d 75, 81 (1st Cir. 1986). A jury's
consideration of extrinsic information is susceptible to harmless-
error analysis, see Lacy, 791 F.2d at 983, and an error will be
deemed harmless if "the beneficiary of . . . [the] constitutional
error [can] prove beyond a reasonable doubt that the error
complained of did not contribute to the verdict obtained." Chapmanv. California, 386 U.S. 18, 24 (1967); see also Williams, 809 F.2d
at 81 n.2. Thus, the jury's consideration of extrinsic
information raises a presumption of prejudice, see Remmer v. United
States, 347 U.S. 227, 229 (1954), and the government bears the
burden of showing beyond a reasonable doubt that the extrinsic
information did not contribute to the conviction, see Williams, 809
F.2d at 81. In order to determine whether the jury's
consideration of extrinsic evidence was harmless error, a reviewing
court must "assess the record as a whole to determine the impact of
the improper evidence upon the jury. . . . The prejudicial effect
of the improper evidence must be weighed against the weight of the
properly admitted evidence." Lacy, 791 F.2d at 986 (quoting Morganv. Hall, 569 F.2d 1161, 1166 (1st Cir. 1978)); see also United
States v. Weiss, 752 F.2d 777, 783 (2d Cir. 1985) (possibility of
prejudice is assessed "by reviewing the entire record, analyzing
the substance of the extrinsic evidence, and comparing it to that
information of which the jurors were properly aware"). 
 Our harmless error analysis thus begins with an
examination of the nature of the extrinsic information to which the
jury was exposed to determine its potential prejudicial effect. As
the government points out, the type of extrinsic information in
this case namely, the appearance of Santana's ears is unusual
in that it is a static, inherent characteristic not subject to
dispute in the classic sense that testimonial, documentary, or
other physical evidence might be. There is no question, however,
that the appearance of Santana's ears was physical evidence tending
to corroborate Agent Tomasetta's identification of him as the
individual he had observed driving the 4-Runner on November 8th 
just as a defendant's tattoo, scar, gold tooth, or other
identifying characteristic visible to a witness but not visible to
a jury during a trial would become evidence only if the defendant
was asked to display the characteristic to the jury. To the extent
that the appearance of Santana's ears was consistent with Agent
Tomasetta's description of the person he had observed on November
8th, the display of his ears was powerful evidence damaging to the
defense. If the government had requested that the display take
place in the context of the trial (as would have been its
prerogative, see supra note 6), with the standard protections
available to a criminal defendant, much of this damage might have
been mitigated through cross-examination, by calling other
witnesses, or in closing argument to the jury. Not surprisingly
(given the government's failure to request the court to direct that
Santana display his ears to the jury during the trial), defense
counsel did not focus particular attention on Agent Tomasetta's
description of the suspect's "protruding ears" in his cross-
examination of Tomasetta or in his closing argument to the jury.
 Moreover, the connection between the extrinsic
information at issue here the appearance of Santana's ears and
an issue material to and disputed throughout the trial the
identity of the person who supplied crack cocaine to Matos is
unmistakable. Cf. United States v. Johnson, 647 F.2d 815, 817 (8th
Cir. 1981) (affirming conviction, notwithstanding jury's exposure
to extrinsic information, where the information was not relevant to
any issue in the case); United States v. McKinney, 429 F.2d 1019
(5th Cir.), modified & rev'd on reh'g, 434 F.2d 831 (5th Cir.
1970)(same). Because no direct evidence was introduced to establish
that Santana was the person who supplied the crack cocaine, the
government's case hinged largely on Agent Tomasetta's
identification of Santana as the person he observed driving the 4-
Runner away from the drug transaction on November 8th. The
extrinsic information at issue here was a critical component of
Tomasetta's identification. The district court itself noted the 
importance of the appearance of Santana's ears as corroborative of
Tomasetta's identification, stating: "I was frankly surprised that
throughout the course of the last trial no one asked, neither the
government nor the jury asked, for it because the whole issue here
has been the ears."
 Nor was the government's case against Santana so
overwhelming as to overshadow the prejudicial effect of the jury's
exposure to information extrinsic to the record during its
deliberations. Cf. United States v. Hall, 116 F.3d 1253, 1255 (8th
Cir. 1997) (affirming conviction notwithstanding jury's
consideration of extrinsic information, and noting the strength of
the government's case); United States v. Bagnariol, 665 F.2d 877,
889 (9th Cir. 1981) (noting "vast body of evidence presented by the
government"); McKinney, 434 F.2d at 833 (affirming conviction where
evidence was overwhelming). Other than Agent Tomasetta's
identification of Santana as the person he had observed driving the
4-Runner on November 8, 1994, the government's evidence against
Santana consisted primarily of the following: (1) the November 8
drug transaction took place in a vehicle registered in his name,
and law enforcement officers observed Santana twenty minutes after
the transaction standing next to the vehicle in front of his
business; (2) on February 23, 1995, Matos called, then visited,
Santana's business shortly after an unexpected drug order was
placed; and (3) on March 23, 1995, Matos told Huynh that the crack
cocaine would be of good quality because his supplier was the "same
guy, red truck." 
 Indeed, the government conceded at oral argument that in
the first prosecution of Santana, when the jury was unable to reach
a verdict, the government presented the same quantum of evidence
that it presented at the second trial. The jury deliberations in
the second trial spanned three days, again suggesting the
difficulty of the deliberations. Moreover, because the jurors
specifically asked to observe Santana without his headphones, they
obviously deemed such evidence important to their deliberations.
See United States v. Luffred, 911 F.2d 1011, 1014-15 (5th Cir.
1990); United States v. Hans, 738 F.2d 88, 92-93 (3d Cir. 1984). 
In these circumstances, it is impossible to conclude beyond a
reasonable doubt that the court's error in allowing the jury to
observe Santana without his headphones during its deliberations did
not contribute to the verdict. Accordingly, we vacate the
conviction and remand the case for a new trial.
 It is so ordered.